[No. S004486. Crim. No. 22955. Apr. 6, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN ALLEN CHAMPION AND CRAIG ANTHONY ROSS,
Defendants and Appellants.

## COUNSEL

R. Charles Johnson and Nicholas C. Arguimbau, under appointments by the Supreme Court, Maureen M. Bodo and Steven E. Feldman for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Robert R. Anderson, John R. Gorey, Shunji Asari, Robert S. Henry and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Stephen Allen Champion of two counts of murder (Pen. Code, § 187),[1] two counts of robbery (§ 211) and one count of burglary (§ 459), finding that he was armed with a firearm in the course of each offense (§ 12022, subd. (a)). On the two counts of murder, the jury found the existence of these special circumstances: robbery murder (§ 190.2, subd. (a)(17)(i)), burglary murder (§ 190.2, subd. (a)(17)(vii)), and multiple murder (§ 190.2, subd. (a)(3)).

The same jury also convicted defendant Craig Anthony Ross of three counts of murder (§ 187), five counts of robbery (§ 211), two counts of burglary (§ 459) and one count of rape in concert (§§ 261, former subd. (2), 264.1), finding that he was armed with a firearm in the course of each offense (§ 12022, subd. (a)). On the three counts of murder, the jury found these special circumstances: robbery murder (§ 190.2, subd. (a)(17)(i)),

---

[1]Unless otherwise stated, all further statutory references are to the Penal Code.

burglary murder (§ 190.2, subd. (a)(17)(vii)), and multiple murder (§ 190.2, subd. (a)(3)). In addition, on one of the counts of murder, the jury found a rape-murder special circumstance (§ 190.2, subd. (a)(17)(iii)).

At the penalty phase, the jury returned verdicts of death as to both defendants. Defendants' appeals to this court are automatic. (§ 1239, subd. (b).)

Although we conclude that certain duplicative special-circumstance findings must be stricken, we affirm both judgments in all other respects.

## I. FACTS

### A. *Facts Relating to Guilt*

#### 1. *Murders of Bobby Hassan and His Son, Eric*

On the morning of December 12, 1980, Mercie Hassan left her home at 849 West 126th Street, Los Angeles, to go to work. Residing with her were her husband, Bobby Hassan (an unemployed carpenter who sold marijuana and sometimes cocaine), and their four children. Mercie spoke to Bobby on the telephone between 11 and 11:30 that morning. Bobby normally picked up their 14-year-old son, Eric, from school at noon and brought him home for lunch.

Sometime around noon, Elizabeth Moncrief, a nurse working for an elderly woman across the street from the Hassan residence, saw Bobby and Eric return home. Half an hour later, she saw a large gold or cream-colored Cadillac containing 4 Black males, ages 19-25, parked in front of the Hassan home. Moncrief went outside and took a close look at the car. About five minutes later, she saw two of the men get out of the car and knock at the Hassans' door. There was a struggle at the door, and the two men entered. The other two men then got out of the car and entered the house, and someone closed the curtains in the Hassan residence.

Later, Moncrief saw all four men leave the house. One was holding a pink pillowcase with something in it; the others were carrying paper bags containing unknown items. Moncrief was able to get a particularly good look at the last man who left the house, a tall man with heavy lips, a scar on his face, and either a chipped tooth or a gap between his teeth. She paid closer attention to this man because she had seen him once in Helen Keller Park, which was just across the street.

Mercie Hassan returned home about 3:30 p.m. The house had been ransacked. Part of the lunch she had prepared for Bobby and Eric was on the

floor, along with wrapping paper from the children's Christmas presents. Several of the presents were missing, as were some colored pillowcases and a .357-caliber Ruger Security Six revolver. Police, called to the scene, found the bodies of Bobby and Eric Hassan in the bedroom, lying on the bed. Each had been shot once in the head. Bobby's hands were tied behind his back, and three rings and a necklace he customarily wore were missing.

Defendant Champion was arrested on January 9, 1981. When arrested, he was wearing a yellow metal ring with white stones and a gold chain necklace that contained a charm bearing half of a king-of-hearts playing card. Mercie Hassan identified the ring and charm as belonging to her husband, Bobby. Latent fingerprints lifted from the Christmas wrapping paper and from a white cardboard box matched defendant Ross's fingerprints.

A month after the robbery, Moncrief selected defendant Champion's picture from a photographic lineup, saying he could have been one of the men she had seen at the Hassan house. Three days later she positively identified Champion at a physical lineup at the Los Angeles County jail. She also positively identified him at trial as the fourth man she saw leaving the Hassan home. In addition, she identified a photograph of a brown Buick automobile linked to defendants (see pt. I.A.2., *post*) as being the car she had seen in front of the Hassan home.[2] Earlier, at a wrecking yard to which the police had taken her, Moncrief recognized the Buick as the car in question because of a distinctive dent on its right front.

On cross-examination, Moncrief acknowledged that at an early stage in the murder investigation she had identified two other men, Benjamin Brown and Clarence Reed, as the men she saw visit the Hassan home, and she had identified their car, a Chrysler, as the one she had seen in front of the Hassan home.

Reed and Brown had become suspects in the police investigation because: (1) both were involved in an attempted robbery elsewhere in Los Angeles the day after the Hassan murders, during which Reed was killed; (2) Mercie Hassan identified Brown as a person who had been to her house to buy marijuana from her husband; and (3) Mercie Hassan told police that on several occasions she had answered telephone calls from a person named "Clarence" who wanted to buy drugs. To show that Reed and Brown did not commit the murders, the prosecution called Brown, who testified that he had spent the day at home, and Reed's employer, who produced a "time card" (on the back of a cigarette carton) showing that Reed was at work in a grocery/liquor store at the time of the murder.

---

[2]Before identifying the photograph of the brown Buick, Moncrief testified that the car she had seen in front of the Hassan home was a gold- or cream-colored Cadillac.

A ballistics expert testified that Bobby Hassan was killed by a .357-caliber bullet with rifling characteristics; the latter are produced by the gun that fired the bullet, and were described by the expert as "six lands and grooves with a left hand twist." The expert also testified that most Colt revolvers produce these particular characteristics. The prosecution produced photographs, found in defendant Champion's home, showing each defendant holding a Colt revolver. But Benjamin Brown, when arrested for the attempted robbery that resulted in the death of Clarence Reed, was found in possession of a gun that produced the same rifling characteristics.

A jury found defendants Champion and Ross guilty of burglarizing the Hassan home and of robbing and killing Bobby and Eric Hassan.

## 2. *The Murder of Michael Taylor*

During the evening of December 27, 1980, three men came to the door of Cora Taylor's apartment at 11810½ Vermont Avenue, not far from the Hassan home. Residing with Cora were her son Michael (who sold marijuana) and her daughter Mary. The men, one of whom Cora identified at trial as defendant Ross, walked into the living room and asked to speak to Michael. When Michael and Mary came out of the next room, accompanied by William Birdsong, a friend who was visiting, one of the men, whom Cora and Mary later identified as Evan Malett, grabbed Birdsong. A struggle ensued, which ended when Malett drew a gun and ordered Cora, Mary, Michael, and Birdsong to sit on the bed. Malett then demanded money and drugs. When Mary said they did not have any, one of the three men hit her in the jaw with his fist. The men then ordered the Taylors and Birdsong to lie face down on the bed, opened Cora's purse, and ransacked the premises. While the three robbers were rummaging through the apartment, a fourth man (apparently a lookout) came to the door but did not enter.

At Cora's urging, Michael told the robbers that there was money in a box in the kitchen. At that point one of the men, whom Mary later identified as defendant Ross, grabbed Mary by the hair and forced her to go into the bathroom, where he raped her. He then left the bathroom, returning moments later to rape Mary again. Thereafter, Malett entered the bathroom and unsuccessfully tried to rape Mary.

The three men then ordered Birdsong and Cora to join Mary in the bathroom. A short time later, Cora and Mary heard a shot. After a few minutes, they left the bathroom and found Michael in the living room, dead. A prosecution expert testified that Michael had died from a single shot from a high-powered weapon (such as a .357 magnum), fired at close range. The

agent also testified that the gun used to kill Bobby Hassan could not have been the murder weapon, but that the bullet could have been fired by the .357-caliber Ruger stolen from the Hassan home.

Missing from the Taylor's apartment was an eight-track tape player. Also missing was a Christmas present—a photo album—which had been taken out of its wrapping.

Later that night, shortly after midnight, Los Angeles County Deputy Sheriff Ted Naimy saw a brown Buick automobile that contained four Black males and did not have its headlights turned on in the neighborhood where Michael Taylor had been murdered. As the Buick pulled alongside of him, Deputy Naimy and his partner ordered it to stop. Instead, the car sped away. As the deputies pursued the Buick, it went out of control, struck a curb, and came to a halt. Its four occupants jumped out of the car and ran. Inside the car, the deputy found the eight-track tape player stolen from the Taylor apartment and the .357-caliber Ruger revolver stolen from the Hassan home. The gun contained two live rounds and an empty shell casing, and smelled as if it had recently been fired. Under the car, Deputy Naimy found the photograph album stolen from the Taylors.

Police searched the neighborhood for the occupants of the Buick. They found Evan Malett hiding in a backyard of a nearby house, in which defendant Champion was living.

Natasha Wright, the Taylors' next-door neighbor, identified defendant Ross at trial as one of the men she saw arrive at the Taylors' apartment. Prosecution experts testified that two latent fingerprints lifted from the bathtub in the Taylors' apartment belonged to Ross, and that spermatozoa found on Mary's pants were consistent with Ross's blood type, which is shared by roughly 11 percent of the population.

The jury convicted defendant Ross of burglarizing the Taylor residence; of robbing Cora, Michael, and Mary Taylor; of raping Mary; and of murdering Michael. Although Cora Taylor identified defendant Champion as one of the robbers, and Mary Taylor testified that Champion was similar in appearance to one of the robbers, Champion was neither charged with nor convicted of any of the crimes committed at the Taylor apartment. (Apparently, no one had identified defendant Champion as a participant in the robbery before trial.)

### 3. *Other Prosecution Evidence at the Guilt Phase*

At the guilt phase of the trial, the prosecution also presented evidence of the murder of Teheran Jefferson. The relevant facts relating to Jefferson's death will be discussed in part II.F.

The prosecution also offered expert testimony that both defendants were members of the Raymond Avenue Crips, a gang whose territory encompassed the houses where the murders occurred; that defendant Ross's nickname in the gang was "Little Evil" or "Evil"; and that defendant Champion's gang nickname was "Trecherous," "Trech," or "Mr. Trech," all standing for treacherous. This testimony will be discussed in part II.G.

In addition, the prosecution introduced a tape recording of a conversation between defendants that took place in a bus transporting them from jail to court. The contents of the tape recording will be discussed in part II.A.

### 4. *Defense Evidence at the Guilt Phase*

Defendant Champion, who was charged only with the burglary of the Hassan residence and with the robbery and murder of Bobby and Eric Hassan, presented an alibi defense. He testified that on the morning of the murders he and his brothers, Reginald and Louis, picked up his paycheck from Prompt Service, a "temporary personnel" agency that had employed him. He then went home, where he spent the afternoon. His brother Reginald corroborated his account, as did his mother.

According to defendant Champion, the ring and charm that he was wearing when arrested and that Mercie Hassan identified as belonging to her murdered husband, Bobby Hassan, had been given to him eight months earlier by one Raymond Winbush, who was killed two weeks after giving him the jewelry. Champion's sister, Rita, testified that she had seen Champion wearing the ring four years before the murders, and the charm a month or two before the murders. The ring and the charm were both mass-produced items (with a combined retail value of roughly $400), and the defense argued that Mercie Hassan had mistakenly identified them as belonging to her murdered husband.

Defendant Ross offered no evidence at the guilt phase.

### B. *Evidence at the Penalty Phase*

At the penalty phase of the trial, the prosecution presented the following evidence of violent criminal conduct involving defendants Champion and Ross.

### 1. *Robbery at the West Covina Bus Station*

On November 6, 1977, Vincent Verkuilen, Jerry Stanger, and Laura Surgot were standing at the Greyhound Bus Depot in West Covina when

eight young men approached them. Two of the youths drew handguns, and one of them demanded Verkuilen's wallet and his watch, while others in the group attempted to take belongings from Stanger and Surgot. When police officers arrived at the scene, the youths ran away; as they did so, the two gunmen fired shots. Verkuilen identified defendant Champion as one of the robbers.

Based on this incident, a petition was filed in juvenile court charging defendant Champion with grand theft, attempted robbery, and robbery. The trial court found the petition to be true, and ordered Champion removed from his home and placed in a "camp community placement" program.

### 2. *Robbery of Jose Bustos*

Court Reporter Buelah Pugh read to the jury in this case the juvenile court testimony of Jose Bustos: On September 27, 1978, Bustos and his wife were in a park, listening to a radio. They were approached by five youths, including defendant Champion. One of the boys took the radio, and when Bustos tried to retrieve it, the other four attacked him. Champion kicked him, hit him on the head with a bottle, and cut his finger with a switchblade knife.

Court Reporter Pugh testified that she had worked in juvenile court for eight years; that a minor in a juvenile proceeding is analogous to a defendant in an adult proceeding; that the referee who hears juvenile proceedings is, "for all intents and purposes, a judge at that hearing;" and that "a finding of true is the equivalent in juvenile court of a finding of guilty in an adult court."

### 3. *Assault on Mark Howard*

On July 29, 1977, Mark Howard, a gang member, was in Helen Keller Park when Walter Gregory approached and said that defendant Ross wanted to talk to him. Howard walked to another part of the park and spoke to Ross, who was with a group of people. Ross demanded that Howard return a radio that Howard had taken from Gregory. Howard said he took the radio because Gregory owed him money. When Howard refused to return the radio, Ross produced a revolver, and said that if Howard did not return the radio he would blow Howard's head off. Howard then slapped Ross, whereupon Ross shot Howard six times in the stomach and the chest. Howard recovered, but a bullet remains lodged close to his spine, and his ability to use his left leg is seriously impaired. As a result of this incident, defendant Ross entered a plea of guilty to a charge of assault with a deadly weapon, and was sentenced to three years in prison.

#### 4. *Defense Evidence*

Thomas Crawford, who was defendant Champion's California Youth Authority parole agent, testified that Champion was cooperative and maintained satisfactory contact in the three months between his release and the time he was arrested for the murders in this case.

Champion's mother testified that on the day he was arrested for the murders, he was scheduled to start work as a tutor at Gompers Junior High School.

Defendant Ross offered no evidence at the penalty phase. The parties stipulated that he was born on February 1, 1959; thus, he was 21 years old at the time of the murders.

At defendants' request, the trial court took judicial notice that Evan Malett was convicted of first degree murder and seven other felonies based on his role in the murder of Michael Taylor and the robberies and rapes at the Taylor residence, and that he was sentenced to a prison term of 46 years to life.

### II. Guilt Phase Issues

#### A. *Severance*

Over defendant Champion's objection, the trial court granted the prosecution's motion to join defendants' cases for trial.[3]

■ Although the Legislature has "expressed a preference for joint trials" (*People* v. *Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25]; see § 1098), the trial court may, in its discretion, grant separate trials: "The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], quoting *People* v. *Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869], fns. omitted; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1286 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) ■ Champion complains that joinder was likely to lead to "prejudicial association"

---

[3]The prosecution originally filed a complaint jointly charging defendants, but because Ross was arrested five months after Champion, the two had separate preliminary hearings and the prosecution filed separate informations against them.

with codefendant Ross. (*Ibid.*) He contends that the evidence of defendant Ross's guilt was strong, whereas the evidence of his own guilt was weak, and that the jury was therefore likely to convict him because he was an associate of Ross. We disagree.

The evidence against defendant Champion was far from weak: An eyewitness identified him as one of the four men that entered the Hassan residence, and when arrested he was wearing a ring and a charm that Mercie Hassan identified as belonging to her husband Bobby Hassan, one of the murder victims. The trial court could reasonably conclude that the jury would be unlikely to convict defendant Champion simply because of his association with defendant Ross.

Defendant Champion points out that if the court had not joined his case with that of codefendant Ross, the jury trying him would not have heard evidence of Michael Taylor's murder, which only Ross was charged with committing. This evidence, Champion argues, was highly prejudicial, because Cora Taylor identified him as one of the men who killed Michael Taylor. Although this evidence may well have hurt Champion at trial, this does not mean that the trial court erred in joining the cases for trial. The prosecution's motion for joinder and Champion's motion for severance were, of course, made before trial. At that time, no eyewitness had identified defendant Champion as one of Taylor's killers; it was only at the trial itself that Cora Taylor unexpectedly identified him. Thus, at the time the trial court made its ruling, it could reasonably conclude that the evidence of Taylor's murder would not adversely affect Champion at trial.

Moreover, the jury could properly consider the evidence that defendant Champion was involved in the murder of Michael Taylor in deciding whether he participated in the murders of Bobby and Eric Hassan, because the killings shared various significant characteristics. The murders occurred in the same neighborhood, 15 days apart. Both involved four perpetrators and the same getaway car; when police seized that car on the night Michael Taylor was killed, they found in it items stolen from both the Hassan and the Taylor homes. In both cases, the victims included drug dealers (Bobby Hassan and Michael Taylor) who were robbed in their homes, ordered to lie on their beds, and shot in the back of the head at close range. These common features of the two killings are sufficiently distinctive to support an inference that both crimes were committed by the same persons. (See *People* v. *Miller* (1990) 50 Cal.3d 954, 987-989 [269 Cal.Rptr. 492, 790 P.2d 1289].)

In addition, on the night Taylor was murdered, police saw a brown Buick automobile, containing four men, driving without its headlights in the neighborhood where the slaying occurred. When shortly thereafter the car crashed

(see *ante*, p. 901), the police found inside the car not only items stolen from the Taylor apartment, but also the gun stolen from the Hassan residence. Because the car contained items stolen during the commission of the Hassan and Taylor killings, the jury could reasonably infer that the same four men who had fled from the Buick had also participated in the murders.

We thus conclude that evidence of the Taylor murder was admissible against defendant Champion. Accordingly, the court's refusal to sever defendant Champion's case from that of defendant Ross did not prejudice Champion. (See *People* v. *Hardy, supra,* 2 Cal.4th 86, 170.)

Defendant Ross too complains of prejudice as a result of the trial court's failure to sever his case from defendant Champion's. But Ross never asked the trial court to sever the cases, did not oppose the prosecutor's motion for consolidation, and never gave the trial court any explanation as to why joinder would prejudice him. Although the parties agreed at trial that defendant Ross would be deemed to have joined in defendant Champion's pretrial motions, which presumably included the severance motion, defendant Champion's severance motion explained only why joinder would harm him; it did not assert that joinder would also be prejudicial to defendant Ross. Accordingly, defendant Ross may not now raise this issue. (*People* v. *Saunders* (1993) 5 Cal.4th 580, 588 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

### B. *Jury Cross-section*

The trial court excused 14 potential jurors after they said that their employers would not pay them throughout the anticipated length of the trial. The court did not ask these potential jurors, and they did not explicitly state, that for them jury service would be a "hardship." Both defendants argue that because the 14 prospective jurors did not say explicitly that jury service would be a "hardship," the trial court lacked sufficient information to discharge them. Defendants rely on former Code of Civil Procedure section 200, which at the time of defendants' trial permitted a trial court to excuse potential jurors "upon finding that the jury service would entail undue hardship . . . ."[4] Defendants also assert that because the 14 discharged prospective jurors were all wage earners, the trial court systematically excluded a distinct class of jurors (wage earners), thereby violating their constitutionally guaranteed right to a fair and impartial jury drawn from a representative cross-section of the community. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 266 [148 Cal.Rptr. 890, 583 P.2d 748].)

---

[4]At the time of defendants' trial, Code of Civil Procedure section 200 provided: "The court shall excuse a person from jury service upon finding that the jury service would entail undue hardship on the person or the public served by the person." (See now Code Civ. Proc., § 204, subd. (b).)

Neither defendant, however, objected to the trial court's removal of any of the 14 prospective jurors, and neither complained that the court had systematically excluded wage earners from the jury. Defendants thus have not preserved this issue for appeal. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 664-665 [286 Cal.Rptr. 801, 818 P.2d 84].)

C. *"Death Qualification" of Jury*

Both defendants challenge the method used in the trial court to question potential jurors regarding their attitudes toward the death penalty, and the manner in which the prosecutor exercised peremptory challenges in response to those questions.

Defendants first complain that it was improper for the prosecutor to exercise peremptory challenges to remove all prospective jurors who expressed reservations regarding the imposition of the death penalty. Assuming for the sake of argument that the prosecutor exercised peremptory challenges for this reason, we have held on numerous occasions that the prosecution may do so. (E.g., *People* v. *Danielson* (1992) 3 Cal.4th 691, 714 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 912 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Turner, supra,* 37 Cal.3d at p. 315.) We see no need to reexamine our holdings in these cases.

■ Next, defendants argue that the trial court should have granted defendant Champion's motion to limit the scope of the parties' questions on voir dire. The motion urged that prospective jurors be asked only four questions on voir dire, and that they be directed to give only "yes or no" answers.[5]

---

[5]Defendant Champion asked that voir dire on jurors' views be limited to "the following explanation and questions, or ones of the Court's choosing of like import":

"In the event that your verdict should be guilty of murder of the first degree and that a special circumstance is found true, without in any way indicating that such will be your verdict, then it will be your duty as jurors to determine whether death or life without possibility of parole is the proper punishment. Therefore, the Court wishes you to answer the following questions, yes or no, without any further statement or explanation. If the question is unclear to you, please ask for it to be repeated, but do not go beyond the limited answers of yes or no. [¶] (1) Do you have such conscientious opinions regarding capital punishment that you could not make an impartial decision as to the defendant's guilt or innocence regardless of the evidence presented? [¶] (2) Do you have such conscientious opinions regarding capital punishment that you could not make an impartial decision as to the truth of the special circumstance regardless of the evidence presented? [¶] (3) Do you have such conscientious opinions regarding capital punishment that if you found the defendant guilty of first degree murder and the special circumstance true, that you would automatically refuse to vote for the death penalty? [¶] (4) Do you have such conscientious opinions regarding capital punishment that if you found the defendant guilty of murder in the first degree and the special circum-

Assuming for the sake of argument that defendants have preserved their right to raise the issue,[6] we find no error. "[T]he scope of the inquiry permitted during voir dire is committed to the discretion of the court." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 48 [5 Cal.Rptr.2d 495, 825 P.2d 388].) The trial court was under no duty to limit the prospective jurors to "yes or no" answers, or to limit voir dire in the manner suggested by defendant Champion.

■ Both defendants also complain about the trial court's questioning of prospective jurors during the "death qualification" process. The court asked the jurors whether their views on the death penalty would *prevent* them from imposing a sentence of death, but the court did not ask the converse question: whether those views would lead them to impose the death penalty "automatically." The court's questions, defendants argue, "had the effect of focusing voir dire on one end of the spectrum," and implied that "the judge was only concerned in eliminating 'pro-life' bias," but not with excusing potential jurors who had a "pro-death" bias. Therefore, defendants assert, the trial court's questions indoctrinated the jury in favor of imposing the death penalty.

A prospective juror may be excused for cause if the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844], fn. omitted.) This is true whether the juror is predisposed to vote for or against the death penalty. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 726-728 [119 L.Ed.2d 492, 501-502, 112 S.Ct. 2222, 2229].)

We agree with defendants that trial courts should be evenhanded in their questions to prospective jurors during the "death-qualification" portion of

---

stance true, that you would automatically vote for the death penalty? [¶] Unless you are *automatically* in all cases going to follow one course or another on the penalty to be chosen, without regard to the evidence, then don't raise your hand to volunteer further information on this subject."

[6]It is unclear whether defendant Champion abandoned his motion, and it is unclear whether defendant Ross ever joined in it. The trial court apparently never ruled on the motion, which was made more than a year before trial by Homer Mason, an attorney for defendant Champion who was subsequently replaced, and although defendant Ross joined in all pretrial motions "made by Mr. Skyers," (defendant Champion's trial counsel), defendant Ross never explicitly joined in the motions made by Mason.

Because the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume that defendants have preserved their right, and proceed to the merits. We have done the same in similar situations in the past. (See, e.g., *People* v. *Fudge* (1994) 7 Cal.4th 1075, 1106-1107 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People* v. *Pinholster, supra*, 1 Cal.4th at p. 912; *People* v. *Malone* (1988) 47 Cal.3d 1, 38 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *McLain* (1988) 46 Cal.3d 97, 110 [249 Cal.Rptr. 630, 757 P.2d 569], *People* v. *Miranda* (1987) 44 Cal.3d 57, 85 [241 Cal.Rptr. 594, 744 P.2d 1127].)

the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors. But we reject defendants' contention that in this case the trial court's questions predisposed the jury in favor of imposing the death penalty. The court did not prevent defense counsel from asking prospective jurors whether their views in favor of the death penalty would substantially impair the performance of their duties, and defendants do not contend that the court erroneously refused to excuse any such jurors for cause. The trial court's questions caused no prejudice, and therefore do not warrant reversal of defendants' convictions.[7]

### D. Tape-recorded Conversation

On August 20, 1981, the prosecutor requested the trial court to issue an ex parte order that both defendants be transported from jail to court together, but separate from other inmates, and that their conversations be tape recorded. The prosecutor asserted that if defendants were transported under these conditions, "it is likely that they will discuss with each other their mutual involvement in the crimes charged herein." After obtaining authorization from the trial court, the police tape recorded defendants' conversations in the van transporting them to and from the court. At trial, the prosecution played the tape recording to the jury, over the objection of both defendants.

In the two tape-recorded conversations, which contained numerous profanities, defendants fantasized about taking a "stroll" out of the jail and about "blow[ing] up" the driver of the transport van and escaping. They spoke in derogatory terms of a man named Ishimoto, apparently a guard at the jail, calling him a "little Jap," a "Buddha head motherfucker," and a "little bastard Buddha head." Their conversations also included the following interchange, in which they talked about Bobby Hassan, Jr., the son of victim Bobby Hassan and a "junior member" of defendants' gang, the Raymond Avenue Crips. (See pt. II.G., *post.*) According to the prosecution, in this interchange defendants discussed whether Bobby Hassan, Jr., had told the police about defendants' participation in the murder of his father and brother, and discussed whether the bed on which victims Bobby and Eric Hassan were lying when they were shot was a waterbed:

C: "Man, shit. I saw that mother fucker Bobby Hassan.

---

[7]This case was tried before our decision in *People* v. *Coleman* (1988) 46 Cal.3d 749, 765 [251 Cal.Rptr. 83, 759 P.2d 1260], when we first held that prospective jurors could be excused for cause because they would automatically vote to impose the death penalty. Thus, here the trial court's failure to ask questions on that issue is understandable.

R: "Bobby Hassan what you mean?

C: "His father—the one that got killed.

R: "A picture?

C: "No, I saw him. He's in the courtroom.

R: "What you mean? He's dead.

C: "No (inaudible)(laughs) the other (inaudible).

R: "Oh, the Raymond Crip.

C: "Yeah.

C: "He always be at all the courts, Cuz.

R: "Yeah?

C: "(Laughs) Him and his mother . . . his other brother and shit. I look at him raw—the mother fucker (laughs).

R: "He's in court (inaudible)?

C: "Yeah, he be at all my courts. I look at him raw, the mother fucker (laughs). I was sleepy and just woke up. . . .

R: "He ain't never said nothing?

C: "No, he's a punk ass.

R: "They supposed to be witnesses?

C: "No, they just come to see what's happening with me. (Laughs) See if I'm going to get convicted and shit.

R: "(Inaudible)

C: "(Inaudible)

R: "Was that a waterbed in that room?

C: "Uh-uh."

Both defendants raise a variety of theories in contending that the trial court erred in admitting the taped conversations.

■ Defendants claim that, by recording their conversations, the prosecution violated their rights to remain silent and to counsel, as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. Defendants rely primarily on *Massiah* v. *United States* (1954) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]. In each of those cases, the prosecution used an informant, acting as a police agent, to obtain incriminating information from a criminal defendant who was awaiting trial, without notifying the attorney appointed to represent the defendant. In each case, the United States Supreme Court held that the procedure violated the defendant's right to counsel.

But in *United States* v. *Henry, supra,* 447 U.S. 264, the high court pointed out that an informant who questions a criminal defendant is unlike "an inanimate electronic device," which "has no capability of leading the conversation into any particular subject or prompting any particular replies." (*Id.* at p. 271, fn. 9 [65 L.Ed.2d at p. 123]; see also *id.* at p. 276 [65 L.Ed.2d at pp. 125-126] (conc. opn. of Powell, J.).) Here, defendants' argument that the prosecution's tape recording of their conversation violated their Sixth Amendment rights is further undermined by *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], which the United States Supreme Court decided after *United States* v. *Henry.* In that case, the high court explained that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. . . . [T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-385].)

Here, the prosecution listened to defendants' tape-recorded conversations, but did not question them; thus, it did not engage in "secret interrogation" by any techniques that were "the equivalent of direct police interrogation." (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-285].) Accordingly, the prosecution did not violate defendants' Sixth Amendment right to counsel. (*People* v. *Lucero* (1987) 190 Cal.App.3d 1065, 1068-1069 [235 Cal.Rptr. 751].)

■ Defendants next argue that by recording their conversations the prosecution violated sections 2600 and 2601, which protect the privacy

rights of prisoners.[8] Defendants rely on *De Lancie* v. *Superior Court, supra,* 31 Cal.3d at pages 867-868, in which we held that sections 2600 and 2601 prohibit police from monitoring the conversations of pretrial detainees when the sole purpose of the monitoring is to gather evidence to use against them at trial. Here, the monitoring preceded our decision in *De Lancie,* and we have held that *De Lancie* is not retroactive and does not require the exclusion of evidence obtained before the filing of our decision in *De Lancie.* (*Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 39 [196 Cal.Rptr. 704, 672 P.2d 110].) Accordingly the trial court properly refused to exclude the tape recording on this ground. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 169-170 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 326-328 [261 Cal.Rptr. 348, 777 P.2d 121].)

Defendants maintain that this case is distinguishable from *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24, because here the taped conversations occurred in a vehicle, while the conversation in *Donaldson* took place at the jail itself. They contend that they had a greater expectation of privacy in the van transporting them to court than they did at the jail, and thus, they assert, the trial court's order permitting the prosecutor to monitor their conversations in the van violated not only sections 2600 and 2601, but also their "reasonable and fundamental constitutional right to privacy." Not so. In *People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389], we held that two suspects who had been arrested and were confined in the back of a police car had no reasonable expectation of privacy, and therefore their tape-recorded conversation was admissible at trial. Defendants in this case had no greater expectation of privacy than the suspects in *Crowson.*

Defendants also contend that the trial court's order permitting law enforcement authorities to record their conversations was impermissible because it was a form of prosecutorial discovery, which, at the time of defendants' trial, was severely limited by several decisions of this court. (*People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534]; *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129,

---

[8]At the time of defendants' conversation, section 2600 provided: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Section 2601 provided that inmates may have personal visits, "provided that the department may provide such restrictions as are necessary for the reasonable security of the institution." Although these statutes appear on their face to regulate only the treatment of inmates in state prison, we have held that they are equally applicable to persons confined in county jail. (*De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 872 [183 Cal.Rptr. 866, 647 P.2d 142].)

466 P.2d 673].)[9] We disagree. This court's limits on prosecutorial discovery were based on the premise that a court order requiring defense counsel to disclose information counsel had gathered on behalf of the defendant was a form of "compelled disclosure" that violated the defendant's privilege against self-incrimination. (*People* v. *Collie, supra,* 30 Cal.3d at p. 50.) In this case, the trial court's order permitting the prosecution to record defendants' conversation lacked any aspects of compulsion. Like a search warrant, the order merely permitted the prosecution to engage in evidence-gathering activities that were permissible at the time the court issued the order.

■ Defendants maintain that even if no constitutional violations occurred, the trial court should have excluded the tape-recorded conversations because the prejudicial effect of the conversations substantially outweighed their probative value. (Evid. Code, § 352.) They contend that because the portion of the conversation immediately preceding their discussion of the waterbed was inaudible (*ante,* p. 910), the prosecution's assertion that they were discussing the bed in the Hassan home was highly speculative and thus of minimal probative value. They assert that their discussion of an escape was "nothing more than two young men's boyish fantasizing" and consequently had little probative value. By contrast, they argue, the taped conversations contained highly prejudicial material: numerous obscenities, gang lingo, racial slurs, and "general 'tough' talk."

Defendants argued at trial that the tape-recorded conversations were irrelevant, but they never asked the court to weigh the conversations' probative value and prejudicial effect; they thus failed to preserve the issue for appeal. (See *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1014-1015 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Even if defendants had adequately challenged the admissibility of the conversations under Evidence Code section 352, we would find no error. Evidence Code section 352 gives the trial court broad discretion when weighing the probative value and prejudicial effect of proffered evidence. Here, the portion of defendants' tape-recorded conversations in which they made reference to the waterbed was immediately preceded by a lengthy discussion of Bobby Hassan, Jr., the son of victim Bobby Hassan. Thus, the trial court could reasonably conclude that the waterbed defendants mentioned was in the Hassan home. Moreover, in that same discussion, defendant Ross asked defendant Champion: "He [Bobby Hassan, Jr.] ain't never said nothing?" Defendant Champion responded:

---

[9]In 1985, after the trial in this case, this court held that prosecutorial discovery violated the California Constitution. (*In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637].) In 1990, the electorate amended the California Constitution by initiative to permit prosecutorial discovery. (See Cal. Const., art. I, § 30, subd. (c); *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304].)

"No, he's a punk ass." The court could reasonably infer from this interchange that both defendants believed that Bobby Hassan, Jr., knew of their participation in the murders, that defendant Ross was asking whether Hassan had spoken to law enforcement authorities about the crimes, and that defendant Champion was explaining that Hassan had not done so.[10] Finally, the trial court could reasonably determine that when they discussed the possibility of escape, the defendants showed a consciousness of guilt. The court did not abuse its discretion in concluding that these portions of the tape recording were sufficiently probative to render the tape recording admissible.

Defendants fault the trial court for not deleting from the tape recording those portions of defendants' conversation that were irrelevant and prejudicial. But defendants never asked the trial court to edit the tape recording, and never notified the court that, in their view, portions of the tape recording were particularly prejudicial. Accordingly, they have not preserved this issue for appeal. (Evid. Code, § 353, subd. (a); *People* v. *Wader* (1993) 5 Cal.4th 610, 635 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

Finally, defendants cursorily argue that the admission of this "extremely inflammatory" evidence was error of constitutional dimension, because the trial court did not give the jurors the cautionary instruction contained in the last paragraph of CALJIC No. 1.00, Fourth edition, 1979,[11] which states: "You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be." (The court's failure to give this instruction will be discussed in pt. II.L.) Defendants do not explain why the failure to give this instruction, when combined with the admission of the tape-recorded conversations, should have given rise to an error of constitutional magnitude, and we can conceive of no reason why it should.

### E. *Fingerprints*

The killers of Bobby and Eric Hassan stole Christmas presents, after unwrapping them, from the Hassan family home. Los Angeles Police Officer Rollins took the wrapping paper and the cardboard boxes in which the presents had been wrapped, and placed them in a Los Angeles Police

---

[10]Because, as will be explained in part II.G., Bobby Hassan, Jr., was a "junior member" of defendants' gang, the Raymond Avenue Crips, it would not be surprising if he knew of defendants' participation in the crimes.

[11]Unless otherwise noted, all CALJIC instructions referred to are from the fourth edition, 1979.

Department evidence locker. Theareafter, Sylvia Conrad, an employee of the Los Angeles Police Department fingerprint laboratory, allegedly sprayed ninhydrin on them. Ninhydrin creates a chemical reaction that causes any latent fingerprints on the sprayed surface to become visible. Conrad apparently discovered two latent fingerprints on the surface of the wrapping paper, and took photographs of the prints. Fingerprint expert Donald Keir compared the latent prints on the two photographs with latent fingerprints made by defendant Ross, and concluded that they were made by the same person.

Conrad did not testify at trial, nor did anyone else who had observed her actions. Fingerprint expert Keir testified that Conrad had taken the steps described above, basing his testimony on her written report. ■ Defendant Ross argues that the trial court should have sustained his objections that this testimony was inadmissible hearsay, and that admission of the hearsay violated his confrontation rights under section 686, subdivision 3, under article I, section 15 of the California Constitution, and under the Sixth and Fourteenth Amendments to the United States Constitution.

We conclude that the trial court properly permitted fingerprint expert Keir to testify regarding the content of the report by Conrad, because the report itself was properly admissible under the business records exception to the hearsay rule.[12] (Evid. Code, § 1271.) That rule provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." Fingerprint expert Keir testified that the report prepared by Conrad was on a form that is filled out in the regular course of business whenever a laboratory employee sprays an item with ninhydrin; that such reports are completed by the person doing the spraying; that Keir knew that Conrad was required to fill out such a form at or near the time she was doing the spraying. Keir described briefly the manner in which a form such as the one prepared by Conrad must be completed.

According to defendant Ross, the report did not qualify as a business record because the prosecutor failed to show that Conrad's report was

---

[12]The trial court, after permitting fingerprint expert Keir to read from Conrad's report, refused to permit the prosecution to admit the report itself into evidence. Nevertheless, because the report was a business record, the court properly permitted Keir, an expert witness, to read from and rely on the report. (Evid. Code, § 801.)

prepared "at or near the time of the act, condition, or event" (Evid. Code, § 1271, subd. (b)), or that "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness" (*id.*, § 1271, subd. (d)). Ross contends that fingerprint expert Keir's testimony was inadequate to establish these facts, because Keir had no personal knowledge of when the report was made. But Keir, who had been employed as a fingerprint expert at the same laboratory where Conrad was a 13-year employee, testified that Conrad was obligated to prepare the report at or near the time that she did the acts described in the report. Keir's testimony was sufficient to demonstrate compliance with Evidence Code section 1271. (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) § 4.1, p. 217.)

Defendant Ross contends that the trial court also erred by permitting Keir to read from a written inventory of items taken from the crime scene that was prepared by Officer Rollins, who took custody of the Christmas wrapping paper and cardboard containers at the scene of the murder and brought them to the Los Angeles Police Department, and to compare that inventory with items listed in Conrad's report. Ross is correct that the inventory was not a business record, because there was no evidence that it was prepared at or near the time that Rollins brought the wrapping paper and other items listed in the inventory to the police department. But Rollins testified that the wrapping paper and cardboard boxes referred to in Conrad's report appeared to be the ones he had taken from the murder scene. Furthermore, Mercie Hassan, wife of murder victim Bobby Hassan, identified the same wrapping paper and boxes, testifying that they had contained the Hassan family's Christmas presents that were stolen by the persons who killed her husband and son. Thus, to the extent that the trial court erred in permitting Keir to read from Rollins's report, the error was harmless under any standard.

Defendant Ross argues that the trial court's denial of his request that the prosecution be ordered to provide him with "blowups" of the photographs of his fingerprints, which the prosecution used against him, denied him the right to present evidence and to ancillary services reasonably necessary to the defense. (See *Coronevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 320 [204 Cal.Rptr. 165, 682 P.2d 360].) We disagree. The prosecution was under no obligation to provide the defense with blowups of the photographs; if defendant Ross wanted them, he was free to make his own. If he lacked the money to do so, the law at that time required a request for funds from a judge "other than the trial judge presiding over the capital case in question." (Former § 987.9, as enacted by Stats. 1977, ch. 1048, § 1, p. 3178.) The record does not show that defendant Ross made such a request.

Defendant Ross also complains that the prosecution did not provide him with normal-size copies of the fingerprint photographs until the morning of

the prosecution's fingerprint expert's testimony. The reasons for the prosecutor's delay were disputed by the parties at trial. Without resolving the dispute, the trial court permitted defense counsel to postpone cross-examination of the prosecution's expert until counsel had had an opportunity to examine the photographs, and defense counsel conducted cross-examination two days later. By giving defense counsel a chance to examine the fingerprint photographs before cross-examining the expert witness, the trial court cured any possible prejudice defendant Ross might have suffered from the prosecution's failure to provide the fingerprint photographs earlier.

### F. *The Murder of Teheran Jefferson*

As previously mentioned (see pt. I.A.3., *ante*), the prosecution introduced evidence of the murder of Teheran Jefferson, which occurred around the time of the Hassan and Taylor crimes. A summary of that evidence follows:

Los Angeles Police Officer Billy Leader arrived at the scene of a homicide at 862 West 126th Street, Los Angeles. He found the victim, Teheran Jefferson, with his upper torso on the bed, and his knees and feet on the floor. Jefferson's hands were tied behind his back, a pillow was over his head, and his mouth was gagged with a T-shirt. He had been shot in the back of the head. The wound was a "contact wound," meaning that the killer had placed a gun against Jefferson's head and pulled the trigger. In the kitchen was a box containing "marijuana debris" and some plastic baggies. In Officer Leader's expert opinion, the owner of the marijuana possessed it for the purpose of sale. Sandra Taylor, Jefferson's ex-girlfriend, testified that Jefferson sold marijuana.

The bullet that killed Jefferson was found under his body. A prosecution ballistics expert testified that the bullet was either of a .38- or .357-caliber, and had rifling characteristics, which were produced by the gun that fired it, and which the expert described as "six lands and grooves and a left hand twist." It was thus similar to the bullet that killed Bobby Hassan, which was a .357-caliber bullet, bearing six lands and grooves and a left-hand twist. The expert was unable to say, however, that the two bullets were fired by the same gun. He also explained that Colt revolvers generally produced six lands and grooves with a left-hand twist.

The prosecution introduced no evidence directly connecting either defendant in this case with Jefferson's murder.

Both defendants contend that the trial court should have excluded evidence of the Jefferson murder because (1) it tended to show a disposition to commit criminal acts, and thus its admission violated Evidence Code section 1101; (2) its probative value was substantially outweighed by its prejudicial effect, in violation of Evidence Code section 352; and (3) admission of the evidence violated defendants' right to due process of law.

Before the prosecutor's opening statement, counsel for defendant Champion objected to the evidence of Jefferson's murder, without, however, stating grounds for the objection. When the trial court asked for "the People's position on this issue," the prosecution responded with a lengthy offer of proof, and explained that the evidence was admissible to show an ongoing conspiracy by defendants to murder drug dealers in their neighborhood, because the crimes exhibited a similar modus operandi, and because the Jefferson murder showed that in this case defendants harbored the intent to kill Bobby and Eric Hassan and (as to defendant Ross) Michael Taylor.

Counsel for defendant Ross then pointed out that the prosecutor had sent the defense attorneys a letter informing them that he intended to use the evidence of the Jefferson murder in aggravation at the penalty phase of the trial, and counsel for Ross argued that this letter misled the defense into believing that the prosecutor would not use this evidence at the guilt phase of trial. The prosecutor responded that he had sent defense counsel a subsequent letter stating his intent to use the evidence of the Jefferson murder at the guilt phase. The trial court then ruled that the evidence would be admitted. After the parties discussed the admissibility of other, unrelated evidence, counsel for defendant Ross noted for the record that he did not recall receiving the subsequent letter mentioned by the prosecutor.

Defense counsel made no further objection to the admission of the evidence of the Jefferson murder until the conclusion of the prosecution's case, when the parties were discussing the admissibility of the prosecution's exhibits. At that time, counsel for defendant Champion objected to the admission of all of the exhibits relating to the murder of Jefferson (consisting of the bullet that killed Jefferson, and photographs of the victim and the scene of the crime), "because of the total irrelevance of the Teheran Jefferson case." Counsel for defendant Ross said that he had the same objection to the exhibits and to "the testimony concerning Teheran Jefferson because it has no connection with this case at all, no similarity." The court overruled the defense objections.

■ Generally, reviewing courts will not consider a challenge to the admissibility of evidence absent " 'a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712]; Evid. Code, § 353, subd. (a).) In this case, defendants never asserted at trial that admission of the evidence of Jefferson's killing violated Evidence Code sections 352 or 1101, or their right to due process of law, the grounds asserted on this appeal. We therefore will not consider these claims on appeal. (*People* v. *Wader, supra,* 5 Cal.4th at p. 635.)

■ Defendants also assert that the evidence of the Jefferson killing should have been excluded because it was irrelevant. Although counsel registered a timely objection to the admission of the *exhibits* relating to Jefferson's death, we question whether their objection to the *testimony* regarding his death was timely, because it was not made until long after the witnesses had testified. Assuming for the sake of argument that we may consider the issue, we find any error in admitting the evidence of Jefferson's death to be harmless. As defendants themselves point out, the prosecution offered no evidence directly connecting defendants to Jefferson's death. Thus, it seems unlikely that the jury gave the evidence substantial weight. We conclude there is no reasonable probability that the outcome of the trial would have been different if the trial court had excluded the evidence of Jefferson's murder. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendants accuse the prosecutor of misconduct, asserting that his offer of proof, setting forth the evidence he intended to introduce regarding Jefferson's murder, misled the trial court into believing that the prosecution would be able to link the killing of Jefferson to defendants. We have examined the offer of proof and find no inaccuracies. In any event, defendants made no objection, after the jury heard the evidence relating to Jefferson's death, on the ground that the evidence was inconsistent with the prosecutor's offer of proof. They thus have not preserved the right to raise the issue on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

### G. *Evidence of Gang Activity*

As previously mentioned (see pt. I.A.3., *ante*), the prosecution called Deputy Sheriff Ronnie Williams, an expert in juvenile gangs, to testify. Deputy Williams was assigned to the "street gang detail" at the Los Angeles County Sheriff's Lennox Sub-Station; for the previous four and one-half to five years his work had involved the investigation of street gangs in the Lennox area. He testified as follows:

Deputy Williams was familiar with the Raymond Avenue Crips. That gang's "prime hangout" was Helen Keller Park. Defendant Ross, defendant Champion, and Evan Malett (identified by Mary and Cora Taylor as the man who held a gun during the robbery in which Michael Taylor was murdered) had each told Williams that they were members of the Raymond Avenue Crips. According to other gang members, the gang's nicknames for defendant Ross were "Evil" and "Little Evil"; Champion's gang nickname was originally "Mr. Crazy 8," and later "Treacherous," "Trech," and "Mr. Trech." Champion, Ross, and Malett were all members of a subgroup of the

Raymond Avenue Crips called the "Old Gangsters," because they had been gang members for a long time.

Deputy Williams also testified about a brown Buick automobile. As we discussed earlier in our summary of the facts, sheriff's deputies saw four Black males in a brown Buick automobile, driving without its headlights, on the night Michael Taylor was murdered. When they attempted to stop the car, it took off at high speed. The deputies gave chase; the car struck a curb and was abandoned by its occupants. Inside the car, police found items stolen from the Taylors' apartment as well as the .357-caliber Ruger revolver stolen from the Hassan residence. According to Deputy Williams, a man named Frank Harris owned the Buick. Three of Harris's sons—Lavell, Marcus, and Michael Player—were members of the Raymond Avenue Crips. Deputy Williams had seen Marcus and Michael Player driving the Buick. In the months immediately preceding the murders of the Hassans and Michael Taylor, Williams had frequently observed defendants together with the Player brothers and Malett.

Deputy Williams explained that gang members use graffiti to "advertise" their gang membership. He had taken three photographs of gang graffiti in the neighborhood of Helen Keller Park. Two of the photographs, which were admitted into evidence, showed a circle with the number 8 and the letters O/R/C. The circle and the number 8 identified defendant Champion by his earlier nickname, "Mr. Crazy 8," and the letters "O/R/C" stood for "Old Raymond Crips." The third photograph showed a building diagonally across the street from the home of Michael Taylor. On the building was written "Trecherous," "Popeye," "Raymond Avenue Crips Cuzzins," and "do-re-me" and a dollar sign. According to Deputy Williams, "Treacherous" was defendant Champion's nickname, "Popeye" was the name of another member of the Raymond Crips, and the word "do-re-me" and a dollar sign referred to the obtaining of money in a robbery or burglary.

Deputy Williams identified the persons appearing in a set of four photographs found in defendant Champion's bedroom when he was arrested. One photograph showed Lavel Player clasping defendant Ross's left hand, while Ross held a revolver in his right hand. A second photograph depicted defendant Ross embracing Marcus Player. A third showed defendant Champion standing in the kitchen, brandishing a revolver, while the fourth depicted Lavel Player holding a bat, with a gun (apparently the same revolver) thrust into the top of his trousers. Deputy Williams also identified three other photographs, which an anonymous person had given him. Two of the photos showed defendant Champion standing face-to-face with Marcus Player, while the third depicted defendant Champion "making a Raymond Crip sign" with his hand.

Deputy Williams also identified Bobby Hassan, Jr., who was the son of murder victim Bobby Hassan and the brother of murder victim Eric Hassan, as a "junior member" of the Raymond Avenue Crips gang.

 Defendants contend that Deputy Williams's testimony was inadmissible and prejudicial. They rely on a variety of theories.

Defendants first argue that the prosecution failed to show that they were members of the Raymond Avenue Crips gang when the crimes in this case occurred. Not so. Deputy Williams testified that defendants admitted to him that they were members of the gang. Defendants contend that they made these admissions to Williams several years before the murders in this case, and that Williams never demonstrated that they were gang members when the murders occurred. This objection goes to the weight, not the admissibility, of Williams's testimony. Based on Williams's testimony that defendants had admitted their gang membership, and that they continued to associate with other admitted gang members until the time of the murders, the jury could reasonably conclude that defendants were still members of the Raymond Avenue Crips at the time of the murders.

Defendants next argue that evidence of their gang membership was irrelevant to any issue in the case, and was a prosecutorial attempt to prove them guilty by association. We disagree.

The prosecution offered substantial evidence that members of the Raymond Avenue Crips participated in the murders of Michael Taylor, Bobby Hassan, and Eric Hassan. Items stolen during each of the murders were found in a car owned by the father of three members of the gang: Lavell, Marcus, and Michael Player. Two witnesses identified another gang member, Evan Malett, as a participant in one of the murders. Given this evidence, proof that defendants were members of the same gang formed a significant evidentiary link in the chain of proof tying them to the crimes in this case.

Moreover, evidence that defendants were members of the Raymond Avenue Crips gang was important to explain the portion of the tape-recorded conversation between defendants in which they discussed Bobby Hassan, Jr. (the son of murder victim Bobby Hassan and the brother of murder victim Eric Hassan). As set forth previously (see pt. II.D., *ante*), defendant Ross asked defendant Champion: "He ain't never said nothing?" Defendant Champion responded: "No, he's a punk ass." These otherwise cryptic comments became significant if defendants and Bobby Hassan, Jr., were members of the same gang. Because the evidence showed them to be members of the Raymond Avenue Crips, the jury could reasonably infer that Bobby

Hassan, Jr., could, through his gang association, have learned of defendants' participation in the murders with which they were charged, that defendants were concerned that he might reveal that information to the police, and that they were discussing this possibility in their tape-recorded conversation. Deputy Williams's testimony that defendants and Bobby Hassan, Jr., were members of the same gang was thus important to give meaning to defendants' discussion.

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) We have said that evidence is relevant if it "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent or motive." (*People* v. *Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Here, as explained above, evidence that defendants were members of the same gang as other persons involved in the commission of the crimes in this case fortified the testimony of the persons who identified defendants as participants in the murders. Thus, evidence of defendants' gang membership tended "logically, naturally, and by reasonable inference" to establish their identities as perpetrators of those offenses, and the trial court did not abuse its "broad discretion" (*ibid.*) when it determined that the evidence of gang membership was relevant. (See *People* v. *Plasencia* (1985) 168 Cal.App.3d 546, 553 [223 Cal.Rptr. 786].)

■■■ Defendants contend that even if the gang membership was relevant, the trial court should nevertheless have excluded that evidence because its probative value was substantially outweighed by its prejudicial effect. (Evid. Code, § 352.) They note that juvenile gangs have been the subject of widespread publicity regarding their illegal and violent activities, and argue that evidence of gang membership creates the risk that the jury will improperly infer that a defendant has a criminal disposition, and therefore is guilty of the offenses charged. (*People* v. *Pinholster, supra*, 1 Cal.4th at p. 945; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569]; *In re Wing Y.* (1977) 67 Cal.App.3d 69 [136 Cal.Rptr. 390].) As defendants point out, evidence of a defendant's criminal disposition is inadmissible to prove that he committed a specific criminal act. (Evid. Code, § 1101.)

Because evidence that a criminal defendant is a member of a juvenile gang may have a "highly inflammatory impact" on the jury (*People* v. *Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351]), trial courts should carefully scrutinize such evidence before admitting it. In this case, however, the trial court reasonably concluded that the probative value of the evidence

of gang membership was not substantially outweighed by its prejudicial effect. As we explained previously, such evidence was significant to connect defendants to the car in which the police found property stolen during the Hassan and Taylor murders, to link them with another gang member (Evan Malett) identified as a participant in one of the murders, and to demonstrate their relationship with Bobby Hassan, Jr., a gang member who was also the son of victim Bobby Hassan. Thus, the trial court did not abuse its discretion in denying defendants' challenge, under Evidence Code section 352, to the admissibility of Deputy Williams's testimony that defendants were members of the Raymond Avenue Crips. (See *People* v. *Sandoval* (1992) 4 Cal.4th 155, 175 [14 Cal.Rptr.2d 342, 841 P.2d 862] [Evidence of gang membership relevant and admissible.].)

 Defendants argue that even if this evidence was admissible, the trial court should not have permitted Deputy Williams to testify that their monickers were "Treacherous" and "Evil," and that they were members of a subgroup of the Raymond Avenue Crips called the "Old Gangsters." Assuming for the sake of argument that the trial court should have excluded this evidence, there is no reasonable probability that the trial court's error in permitting this testimony affected the jury's verdict. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.) The error was therefore harmless. Furthermore, defendant Ross never objected to Deputy Williams's testimony that Ross's nickname was "Evil."[13] He is therefore barred from raising this objection on appeal. (*People* v. *Wader*, *supra*, 5 Cal.4th at p. 635.)

Defendants further complain that the trial court erred in permitting Deputy Williams to testify regarding the gang-related graffiti. In particular, defendant Champion argues that the trial court should have barred Williams from testifying about the graffiti on a building across the street from the Taylor residence, containing the words "Treacherous," "Popeye," "Raymond Avenue Crips Cuzzins," and "do-re-me" together with a dollar sign. As we mentioned earlier, Deputy Williams testified that "Treacherous" was defendant Champion's nickname, "Popeye" was the name of another member of the Raymond Crips, and the word "do-re-me" with a dollar sign referred to the obtaining of money in a robbery or burglary. Assuming that defendant

---

[13]Defendants' objections to Deputy Williams's testimony were made in an *in limine* motion before Williams testified, in response to an offer of proof from the prosecution. The prosecutor's offer of proof did not mention that defendant Ross was nicknamed "Evil." Defendant Ross did not object when Deputy Williams testified, before the jury, that his nickname was "Evil." (See *People* v. *Morris* (1991) 53 Cal.3d 152, 189-190 [279 Cal.Rptr. 720, 807 P.2d 949].)

Champion adequately objected to this testimony,[14] any error in admitting the graffiti testimony was harmless. Although it could be inferred from the graffiti that defendant Champion participated in the robbery and murder of Michael Taylor, defendant Champion was neither charged with nor convicted of those offenses. Any bearing the graffiti had on Champion's guilt of the crimes of which the jury eventually convicted him— the robberies and murders of Bobby and Eric Hassan—was tangential, and not likely to affect the outcome of the case.

■ Defendants contend that the trial court should have excluded two photographs used by Deputy Williams at the trial. One of the photographs showed defendant Ross brandishing a revolver; the other photograph depicted defendant Champion with the same gun. These photographs were highly relevant. A prosecution expert testified that the gun depicted in each photograph was a Colt revolver, either a .357 or a .38 Special. The same expert, analyzing the bullet that killed Bobby Hassan, determined that the bullet was .357-caliber; the bullet bore markings (produced by the gun that fired it) that the expert described as "six lands and grooves with a left hand twist." According to the expert, Colt revolvers of the type depicted in the photographs fire .357-caliber bullets. Bullets fired by such revolvers have six lands and grooves with a left-hand twist. Photographs showing both defendants in possession of the type of gun used to kill Bobby Hassan were obviously relevant, and the trial court therefore did not abuse its discretion in admitting them.

■ Defendants assert that the trial court erred in permitting the prosecution to recall Deputy Williams to explain the meaning of a number of the words used by defendants in their tape-recorded conversation in the van transporting them to the jail.[15] They contend that this testimony was beyond the scope of Williams's expertise. We do not agree. Because Deputy Williams had spent a number of years investigating and associating with juvenile gangs, the trial court could reasonably conclude he was sufficiently familiar with gang terminology to accurately interpret the words used by defendants. The use of an expert for this purpose is not uncommon. (See, e.g., *People v. Fudge, supra,* 7 Cal.4th 1075, 1111; *People v. Velasquez*

---

[14]Because Deputy Williams was unable to testify that defendant Champion was the author of the graffiti, the graffiti was hearsay when admitted to show that defendant Champion had committed a robbery. Defense counsel never specifically objected that the graffiti was hearsay; he did, however, point out that "it can't be established as to who put the writings on the wall" as part of a general objection to all of Deputy Williams's testimony.

[15]For example, Deputy Williams testified that the word "cuz" or "cousin" refers to a fellow gang member, that "homey" is an abbreviation for "home boy" and refers to a partner or friend, that "pen" refers to the inmate reception lockup at the jail, and that "gauge" is a shotgun.

(1976) 54 Cal.App.3d 695, 699 [126 Cal.Rptr. 656].) Here, the trial court could reasonably conclude that the meaning of some of the words used by defendants were "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) Defendants also contend that the deputy's testimony was irrelevant and that its primary purpose was to stress that defendants spoke a different language than the members of the jury, thereby playing on the jurors' fears of the unknown and of ethnic or social minorities. Because defendants did not object to Deputy Williams's testimony on this ground, they are barred from asserting it on appeal. (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330].)

Defendants' objections to the admissibility of Deputy Williams's testimony were made *in limine*, immediately before Williams testified. After the prosecution's offer of proof regarding the deputy's proposed testimony, the trial court overruled defendants' objections. Defendants characterize the prosecutor's offer of proof as misleading, because it did not describe certain aspects of Williams's testimony that suggested it lacked reliability and did not mention that Williams would give highly prejudicial testimony. These omissions, defendants contend, undermined the trial court's ability to properly exercise its discretion when ruling on the admissibility of Williams's testimony. We have examined the prosecutor's offer of proof; in our view, it is essentially accurate. To the extent that there were variations between the offer of proof and Deputy Williams's testimony, defendants should have brought them to the court's attention and should have requested that Williams's testimony be stricken. Because they failed to do so, they now may not now complain of any such variations. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 142 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

Defendants assert that the admission of Deputy Williams's testimony rendered the trial "fundamentally unfair," thereby violating their right to due process of law; that the prosecution used this testimony to prove them "guilty by association," in violation of their First Amendment right to freedom of association; and that Deputy Williams's testimony regarding the gang-related graffiti violated their Sixth Amendment right to confront adverse witnesses. We find no constitutional violation. As we have discussed, the trial court properly admitted the vast majority of Deputy Williams's testimony. Those portions of Williams's testimony that the trial court should have excluded did not render defendants' trial "fundamentally unfair," and did not violate their right to due process of law.

H. *Mistrial Motion*

As we discussed earlier, the defense theory was that Benjamin Brown and Clarence Reed had committed the murders of Bobby and Eric

Hassan, based on witness Elizabeth Moncrief's initial identification of them as two of the persons she had seen enter the Hassan home, and her initial identification of their car, a Chrysler, as the one parked in front of the Hassan residence. The prosecutor called as a witness investigating officer David Crews to explain why the sheriff's deputies had ultimately concluded that Reed and Brown were innocent. The prosecutor asked Crews: "Were you able to determine whether Mr. Reed or Mr. Brown had any criminal record prior to the crime that they had been arrested for?" Over a defense objection, Officer Crews testified that neither suspect had a criminal record. Defendants later moved for a mistrial on the ground that the question and answer were prejudicial. The trial court denied the motion.

Defendants challenge the trial court's ruling. They claim that by suggesting that Reed and Brown were innocent because they had no criminal record, the prosecutor implied that defendants did have a criminal record. We disagree. The trial court could reasonably conclude that the jury was unlikely to draw the highly speculative inference that defendants had a criminal record. Any danger that the jury would do so could have been dealt with by a judicial admonition that the jury should not infer from the question and answer that defendants had a criminal record.[16] (See *People* v. *Green*, *supra*, 27 Cal.3d at p. 27.) The trial court properly concluded that there was no need to declare a mistrial.

I. *Sufficiency of Evidence*

 Defendant Champion argues that the evidence is insufficient to support his convictions for burglarizing the home of Bobby and Eric Hassan, and for robbing and murdering them. Asserting that the prosecution's case was based almost entirely upon Elizabeth Moncrief's identification of him as one of the killers, Champion contends that her testimony was inherently unbelievable. He points out that Moncrief initially identified two other men, Benjamin Brown and Clarence Reed, as the killers; that she initially identified Brown and Reed's car, a Chrysler, as the one parked in front of the Hassan home; and that at trial Moncrief said the robbers were in a "gold or cream" colored Cadillac, although shortly thereafter she identified a photograph of the brown Buick linked to defendants as the car she had seen. Champion also notes inconsistencies in Moncrief's description of the facial characteristics of the man she ultimately identified as defendant Champion, and changes in her testimony regarding the number of headlights on the getaway car.

---

[16]Defense counsel did not seek such an admonition; their failure to do so did not demonstrate inadequacy, as they could reasonably conclude that the best approach was to let the matter rest rather than to draw the jury's attention to the possibility that defendants had criminal records.

Defendant Champion's initial premise—that the prosecution relied almost exclusively on witness Moncrief's testimony—is faulty. Significant other evidence corroborated Moncrief's testimony identifying Champion as one of the robbers. When arrested, Champion was wearing a distinctive ring and charm that Mercie Hassan identified as belonging to her murdered husband, Bobby Hassan. Champion could offer no persuasive explanation for his possession of these items; his testimony that six months before Bobby Hassan's death a fellow gang member—who was later killed—had given the jewelry to him "to hold" was highly unconvincing. Also, defendant Champion's tape-recorded conversation with defendant Ross, which was played for the jury, contained statements by Champion implicating him in the murders. In addition, photographs found at Champion's home depicted him with a revolver of the type used to kill Bobby Hassan. Moreover, a witness identified Champion as a participant in a similar robbery and murder, that of Michael Taylor, which occurred only two weeks after the robbery and murder of Bobby and Eric Hassan in the same neighborhood.

Moreover, although there were inconsistencies in witness Moncrief's testimony, the jury could reasonably find her testimony credible. She positively identified defendant Champion on three occasions: at a photographic lineup, at a live lineup, and at trial. She testified that she got a particularly good look at Champion because, as he was leaving the house, he faced her directly. She also explained that she recognized defendant because she had seen him in Helen Keller Park; this was consistent with Deputy Williams's testimony that defendant Champion frequented that neighborhood park. Moncrief testified that the fourth robber she saw leaving the Hassan home (whom she identified as defendant Champion) was tall and had thick lips, a facial scar, and either a chipped tooth or a gap between his teeth; Champion had each of these characteristics. Thus the evidence, although not overwhelming, was ample to support the convictions.

## J. Aider and Abettor Liability

The trial court instructed the jury on aiding and abetting by reading to them modified versions of former CALJIC Nos. 3.00 (1981 rev.)[17] and 3.01

---

[17]The trial court instructed the jury: "The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits the crime, aid and abet in its commission, or [¶] 3. Those who, whether present or not at the commission of the crime, advise and encourage its commission. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his

(1980 rev.).[18] In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held that these instructions did not adequately describe the mental state of an aider and abettor. ▮ We explained: "[T]he aider and abetter must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abetter must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abetter will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Id.* at p. 560.) The instructions, we held, were "sufficiently ambiguous to conceivably permit conviction upon a finding of an intentional act which aids, without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense." (*Id.* at p. 561.)

▮ Defendants argue that the erroneous instructions require reversal of their murder convictions. We rejected a similar claim in *People* v. *Beardslee* (1991) 53 Cal.3d 68 [279 Cal.Rptr. 276, 806 P.2d 1311], in which we held that any deficiency in former CALJIC Nos. 3.00 and 3.01 was rendered harmless by the trial court's instruction to the jury that if the defendant was not the actual killer, it should find the special circumstance true only if the defendant " 'intentionally aided . . . or assisted the actual killer in the commission of the murder in the first degree . . . .' " (53 Cal.3d at p. 91.) In finding the special circumstance allegation to be true, the jury necessarily determined that the defendant shared the killer's intent when he aided and abetted the commission of the murder; thus, any error in the aiding and abetting instructions was harmless. (*Ibid.*; see also *People* v. *Carrera, supra,* 49 Cal.3d 291, 310-311; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Our decision in *People* v. *Beardslee, supra,* 53 Cal.3d 68, is dispositive of defendants' claim in this case. Here, the trial court gave the jury the same instruction on the special circumstance allegations that was given to the jury in *Beardslee*. The import of this instruction was reinforced by the prosecutor who, in his closing argument, explained to the jury that this instruction meant that "[i]t must therefore be established, before you can convict [defendants] of special circumstances, that . . . they share, along with the

---

confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged."

[18]The trial court instructed the jury: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime."

trigger man, the intent that these victims perished in the course of these crimes." Thus, as in *Beardslee*, when the jury in this case found the special circumstance allegations true, it also necessarily found that defendants shared the intent of the killers when they aided and abetted the murders. The erroneous instruction on aiding and abetting therefore did not prejudice defendants.

Both defendants also contend that their convictions for robbery and burglary must be reversed because of the defective aiding and abetting instructions; in addition, defendant Ross argues that his rape conviction should similarly be reversed. Not so. As explained above, the jury instructions for the burglary-murder, robbery-murder, and rape-murder special circumstances required the jury to find that the defendant, while committing the secondary crime giving rise to the special circumstance, "intentionally aided . . . or assisted the actual killer in the commission of the murder . . . ." The jury could not have found these special circumstance allegations true without concluding that the defendants acted with the appropriate mental state when they committed their acts of robbery, burglary, and rape. Therefore, with regard to these offenses, the erroneous instruction on aiding and abetting was harmless. (*People* v. *Carrera, supra,* 49 Cal.3d at pp. 310-311.)

### K. *Instruction on Special Circumstances: Intent to Kill*

██ Defendants argue that the special circumstance allegations should be set aside because the trial court did not instruct the jury that it must find that defendants harbored the intent to kill in order to find the allegations true. Because the prosecution offered no evidence that defendants were the actual killers of any of the victims in this case, the jury could find the special circumstance allegations to be true as to each defendant only if it concluded that the defendant had the intent to kill. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147-1150 [240 Cal.Rptr. 585, 742 P.2d 1306].)

The trial court, however, adequately instructed the jury on intent to kill: "If defendant was not the actual killer it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant." We have repeatedly held that a reasonable juror would construe this instruction as imposing a requirement of intent to kill. (*People* v. *Neely* (1993) 6 Cal.4th 877, 898 [26 Cal.Rptr.2d 189, 864 P.2d 460]; *People* v. *Pinholster, supra,* 1 Cal.4th at p. 954; *People* v. *Sanders* (1990) 51 Cal.3d 471, 516-517 [273

Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)[19]

## L. *CALJIC No. 1.00*

The trial court read to the jury CALJIC No. 1.00, which explains the respective duties of judge and jury, but the court left out the instruction's last two paragraphs, which tell the jury that the fact that the defendant has been arrested and brought to trial is not evidence of guilt, and that the jury should not be influenced by sympathy or public feeling.[20] This omission, defendants assert, violated their federal constitutional right to due process of law.

We rejected that contention in *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 71-73 [14 Cal.Rptr.2d 133, 841 P.2d 118], holding that the trial court's failure to instruct on the last two paragraphs of CALJIC No. 1.00 should be evaluated under the test for nonconstitutional error: whether there is a reasonable probability that the result would have been more favorable to the defendants in the absence of the error. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) As in *Hawthorne* and in *People* v. *Duncan* (1991) 53 Cal.3d 955, 971-972 [281 Cal.Rptr. 273, 810 P.2d 131], the trial court here instructed the jury that its duty was "to determine the facts of the case from the evidence received in the trial and not from any other source" (CALJIC No. 1.00), that the defendants are "presumed to be innocent until the contrary is proved" (CALJIC No. 2.90) and that the prosecution had "the burden of proving [defendants] guilty beyond a reasonable doubt" (*ibid.*). In essence, the omitted paragraphs of CALJIC No. 1.00 are amplifications of these instructions, and their absence did not cause the jury to misconstrue its role. Consequently, defendants suffered no prejudice.

Defendants accuse the prosecutor of deliberately misleading the trial court when he submitted CALJIC No. 1.00 without its last two paragraphs, and

---

[19]Also, in this case the prosecutor conceded that this instruction required the jury to find that defendants acted with the intent to kill, when it told the jurors that to find the existence of special circumstances as to each defendant, they must find that the defendant "share[d], along with the trigger man, the intent that these victims perish[ed] in the course of these crimes."

[20]These are the two paragraphs of CALJIC No. 1.00 that the trial court omitted: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial. None of these circumstances is evidence of his guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent. [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

without telling the court he had done so. The record, however, contains no evidence that the omission was deliberate. In another case in which the trial court omitted to read the same two paragraphs, we hypothesized that the omission may have been inadvertent "since the omitted portion was on the second page of the instruction." (*People* v. *Duncan, supra,* 53 Cal.3d at p. 971.) This may also have been the cause of the omission here.

## M. *Conspiracy Instruction*

At the request of defendant Champion, the trial court instructed the jury: "Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy." (CALJIC No. 6.13.) Both defendants now argue that the court should not have given the instruction, but they do not explain how the instruction prejudiced them or in any way misstated the law.

Defendants also complain that the prosecutor was guilty of misconduct because, throughout the trial, he asserted that the murders of Bobby and Eric Hassan and the murder of Teheran Jefferson were part of an ongoing conspiracy involving defendants and other members of the Raymond Avenue Crips gang. Even if we were to assume that the prosecutor's allegations of a conspiracy were in some way improper, defendants have not preserved their right to raise the issue on appeal, because they failed to object to the prosecutor's comments at trial. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

## N. *Instruction on Jury Unanimity*

Defendants assert that the prosecution's evidence against them did not clearly show whether they were direct perpetrators or aiders and abettors of each of the offenses charged. Accordingly, they argue, the trial court should, on its own motion, have instructed the jury that it could not convict defendants of any offense unless it unanimously agreed either that defendants were direct perpetrators of that offense, or that they were aiders and abettors. (See CALJIC No. 17.01.) The trial court's failure to do so, defendants contend, requires reversal of their convictions on all charges.

We rejected the identical claim in *People* v. *Beardslee, supra,* 53 Cal.3d at pages 92-94. As we explained, when "the two theories, that [the defendant] was the actual perpetrator and that he was an aider and abetter, were based on a single course of conduct," jury unanimity is not required. (*Id.* at p. 93.) Accordingly, here the trial court did not err when it failed to give a unanimity instruction.

Defendant Ross, noting that victim Mary Taylor testified he had raped her on two separate occasions, contends that his rape conviction should be reversed because the trial court failed to instruct the jury that it could convict him only if it unanimously agreed that he committed a particular act of rape. We find no error, for the reasons explained below.

In this case, the rape victim testified that defendant Ross raped her twice, but the two rapes were virtually identical. After raping Taylor in the bathroom, Ross left, returning shortly thereafter to rape her again. Ross offered no evidence tending to show that he committed one of the rapes but not the other; rather, his counsel argued that he did not participate in any of the crimes occurring in the Taylor home. Thus, once a juror determined that defendant Ross committed one of the two rapes, it is inconceivable that the juror would not also conclude that Ross also committed the second rape of the same victim.

In *People* v. *Beardslee, supra,* 53 Cal.3d 68, we held that under circumstances such as those described above, a trial court need not give a unanimity instruction. We explained: " 'A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.' [Citations.] '[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case.' " (*Id.* at p. 93; see also *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423].) Because in this case any juror believing that defendant Ross committed one of the two rapes testified to by Mary Taylor would inexorably believe that he also committed the other, the trial court did not err in failing to give a unanimity instruction.[21]

## O. *Sufficiency of Evidence—Rape in Concert*

Defendant Ross argues that the evidence was insufficient to support the jury's verdict finding him guilty of rape in concert. (§ 264.1.) Relying on *People* v. *Wheeler* (1977) 71 Cal.App.3d 902, 907 [139 Cal.Rptr. 737], he asserts that rape in concert occurs only when the victim is subjected to a "gang-type sexual assault." He argues that the rapes here were not "gang-type" assaults, and thus did not constitute rape in concert within the meaning of section 264.1.

---

[21]For the same reason, we reject defendant Ross's contention, in his closing supplemental brief, that the trial court should have instructed the jury that it must unanimously agree as to which items Ross stole from Bobby and Eric Hassan.

In *People* v. *Wheeler, supra*, 71 Cal.App.3d 902, the defendant and an associate, Williams, fondled the victim and forcibly removed her clothing; thereafter, the defendant held the victim's arm while Williams raped her. In the course of discussing the adequacy of the trial court's instruction on the statutory requirement that the rape be accomplished by "force and violence," the Court of Appeal commented that section 264.1 "provides increased penalties for those who participate in gang-type sexual assaults." (71 Cal.App.3d at p. 907.) Similarly, the Court of Appeal in *People* v. *Calimee* (1975) 49 Cal.App.3d 337, 341 [122 Cal.Rptr. 658], while rejecting the defendant's contention that the trial court erred in instructing the jury that the term "in concert" was synonymous with aiding and abetting, stated: "The obvious purpose of [section 264.1] is to provide increased punishment when there is a gang sexual assault and to insure that those who participate in such assaults, either by personally engaging in the ultimate sexual act or by voluntarily helping others to accomplish it, receive the enhanced punishment." Other Courts of Appeal, relying on *Wheeler* and *Calimee*, have agreed that the Legislature's purpose in enacting section 264.1 was to discourage "gang type" assaults. (*People* v. *Guiterrez* (1991) 232 Cal.App.3d 1624, 1639 [284 Cal.Rptr. 230]; *People* v. *Jones* (1989) 212 Cal.App.3d 966, 969 [260 Cal.Rptr. 853]; but compare *People* v. *Lopez* (1981) 116 Cal.App.3d 882, 887 [172 Cal.Rptr. 374] ["If the Legislature wanted to limit section 264.1 to gang rape with only the active participants being held culpable, it could easily have done so . . . ."].)

None of the decisions cited above, however, suggests that evidence of the type offered by the prosecution in this case is insufficient to support a jury's finding that a rape occurred "in concert." The evidence here showed that while his companions held other members of Mary Taylor's family at gunpoint, defendant Ross grabbed Mary by the hair and pushed her into the bathroom, where he forcibly raped her twice. He then ordered her to remain in the bathroom, and one of his crime partners, whom Mary Taylor identified as Evan Malett, entered the bathroom and sexually assaulted her. Although none of Ross's companions were in the bathroom when he was raping Mary, they were present in the home where the rape occurred, and their acts assisted him in committing the rape. This evidence, in our view, is sufficient to support the jury's verdict finding Ross guilty of rape "in concert."[22]

P. *Sentence Choices*

 The trial court imposed consecutive sentences for the robbery offenses of which defendant Ross was convicted. Ross contends that the trial

---

[22]We do not address whether a rapist acts "in concert" when his accomplice assists in the commission of the crime, but is not present at the scene (for example, when the accomplice provides the rapist with information about the victim, or pays the rapist to commit the act).

court erroneously failed to state reasons for its decision to impose consecutive sentences on these crimes.

The decision to impose consecutive sentences is, as defendant Ross points out, a "sentence choice" for which, under the determinate sentencing law, the trial court must give reasons. (§ 1170, subd. (c); *People* v. *Gutierrez* (1991) 227 Cal.App.3d 1634, 1638 [278 Cal.Rptr. 748].) Thus, here the trial court erred in not giving reasons for imposing consecutive sentences.

We need not, however, remand the case for resentencing. As the trial court pointed out when it selected the upper term of imprisonment for the principal term, Ross's probation report noted 10 circumstances in aggravation applicable to defendant Ross,[23] and no circumstances in mitigation. It is inconceivable that the trial court would impose a different sentence if we were to remand for resentencing. Accordingly, we find the trial court's failure to state reasons for imposing consecutive sentences to be harmless. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 233 [207 Cal.Rptr. 549, 689 P.2d 121]; *People* v. *Gutierrez, supra,* 227 Cal.App.3d at p. 1638.)

■ Defendant Ross argues that consecutive sentences for most of the robbery charges were barred by section 654, because they were part of only two continuous courses of conduct: that occurring at the Hassan residence, and that occurring at the Taylor home.[24] Not so. When a defendant engages in violent conduct that injures several persons, he may be separately punished for injuring each of those persons, notwithstanding section 654. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d

---

[23]Among the circumstances in aggravation were the following: The robberies "involved great violence, great bodily harm, threat of great bodily harm, [and] other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 421(a)(1)); one of the victims (Eric Hassan) was particularly vulnerable (Cal. Rules of Court, rule 421(a)(3)); the manner in which the crimes were carried out indicated "planning, sophistication, or professionalism" (Cal. Rules of Court, rule 421(a)(8)); Ross "engaged in violent conduct which indicates a serious danger to society" (Cal. Rules of Court, rule 421(b)(1)); Ross's prior convictions and juvenile adjudications were numerous and of increasing seriousness (Cal. Rules of Court, rule 421(b)(2)); Ross had served a prior prison term (Cal. Rules of Court, rule 421(b)(3)); Ross was on parole when he committed the robberies in this case (Cal. Rules of Court, rule 421(b)(4)); and Ross's prior performance on parole had been unsatisfactory (Cal. Rules of Court, rule 421(b)(5)). (See also Cal. Rules of Court, rule 425(b) [any circumstance in aggravation set forth in rule 421 may be considered in deciding whether to impose consecutive sentence].)

[24]Section 654 provides in relevant part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." We have held that when a defendant's course of conduct violates more than one statute, a defendant may only be punished for one offense if " 'all of the offenses were incident to one objective.' " (*People* v. *Latimer* (1993) 5 Cal.4th 1203, 1208 [23 Cal.Rptr.2d 144, 858 P.2d 611].)

839].) Robbery is violent conduct warranting separate punishment for the injury inflicted on each robbery victim. As we explained in *People* v. *Miller* (1977) 18 Cal.3d 873, 886 [135 Cal.Rptr. 654, 558 P.2d 552]: "The robbery of a victim at gunpoint has been held to be an act of violence such as to preclude application of section 654 in the case of multiple convictions involving multiple victims."

The trial court also stated that in the event defendant Ross's death sentence was commuted or reduced by the Governor or this court, it was the trial court's view that Ross's sentence on his three murder charges should run consecutive to one another. Ross argues that the trial court failed to give adequate reasons for this "sentence choice." But the trial court's views on the sentence that *should* be imposed if Ross's death sentence is commuted or reduced at some future date are not part of Ross's sentence; they are nothing more than the court's personal opinion. They are not legally binding, and the trial court was under no obligation to explain the reasons for its views.

### Q. *Multiple Special-circumstance Findings*

The jury found six special circumstance allegations true as to each defendant as a result of the killings of Bobby and Eric Hassan: burglary murder, robbery murder, and multiple murder for the killing of Bobby Hassan, plus the same three special circumstances for the killing of Eric Hassan. As to defendant Ross, the jury also found four special circumstances true as a result of the killings of Michael Taylor: burglary murder, robbery murder, rape murder, and multiple murder.

Defendants argue the trial court should have stricken three of the four robbery and burglary special circumstances resulting from the killing of Bobby and Eric Hassan because they occurred during a single course of conduct. (See § 654.) For the same reason, defendant Ross argues that the trial court should also have stricken one of the two robbery and burglary special circumstances resulting from the killing of Michael Taylor. We have in the past rejected a similar contention (*People* v. *Andrews* (1989) 49 Cal.3d 200, 224-225 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Melton* (1988) 44 Cal.3d 713, 766 [244 Cal.Rptr. 867, 750 P.2d 741]) and see no reason to reconsider it here.

Defendants further contend the trial court should have stricken one of defendant Champion's two multiple-murder special circumstances, and two

of defendant Ross's three multiple-murder special circumstances,[25] as duplicative. They are correct. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1273-1274 [232 Cal.Rptr. 849, 729 P.2d 115].) We have, however, consistently found such error to be harmless (see, e.g., *People* v. *Jones* (1991) 53 Cal.3d 1115, 1149 [282 Cal.Rptr. 465, 811 P.2d 757]; *People* v. *Andrews*, *supra*, 49 Cal.3d at pp. 225-226), and we do so here.

### III. PENALTY PHASE ISSUES

#### A. *Evidence of Prior Juvenile Adjudications*

At the penalty phase, the prosecution introduced evidence that on November 6, 1977, defendant Champion was one of eight young men who robbed or attempted to rob three people at a Greyhound Bus Depot in West Covina, County of Los Angeles. The prosecution also introduced, over defendant Champion's objection, evidence that as a result of this episode he was charged in juvenile court with robbery, attempted robbery, and grand theft; that the charges were found true; and that he was made a ward of the court and placed in a camp.

The prosecution also called Court Reporter Buelah Pugh, who read to the jury Jose Bustos's juvenile court testimony, in which he stated that a group of five males, including defendant Champion, had robbed and assaulted him. Court Reporter Pugh also testified that juvenile court proceedings are "analogous" to adult criminal proceedings, that the referees and commissioners who hear juvenile proceeding are, "for all intents and purposes," the equivalent of judges, and that "a finding of true is the equivalent in Juvenile Court of a finding of guilty in an adult court."

■ Defendant Champion makes two related contentions regarding this evidence.

First, Champion argues that the prosecution was not entitled to use the facts surrounding the robberies as evidence in aggravation at the penalty phase of his capital case. He is wrong. At the penalty phase of a capital case, the prosecution may show "criminal activity by the defendant which involved the use or attempted use of force or violence . . . ." (§ 190.3, factor (b).) Champion concedes that the robbery at the West Covina bus station and

---

[25]Defendant Ross asserts that with respect to each of the three murders he was convicted of committing, the jury found two multiple-murder special circumstances to be true, for a total of six multiple-murder special circumstances. In our view, the record does not support this assertion. Although the jury made findings, as to each murder, that Ross had also murdered two other persons, Ross was charged with and convicted of only three multiple-murder special circumstances: one as to each murder victim.

the assault and robbery of Jose Bustos each involved the use or attempted use of force or violence, but argues that they did not involve "criminal activity" because he was a minor when the violent activity occurred. We have rejected a similar contention on several occasions (*People* v. *Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Cox, supra,* 53 Cal.3d at p. 688; *People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270]).

Next, defendant Champion asserts that the trial court erred when it admitted evidence that juvenile court allegations against Champion arising out of the robbery at the bus station were found true. We agree. As we explained in *People* v. *Cox, supra,* 53 Cal.3d at page 689: " 'It is not the [juvenile] adjudication, but the conduct itself, which is relevant.' [Citations.] Accordingly, . . . evidence of a wardship adjudication is inadmissible . . . ."

Defendant Champion further contends that the erroneous admission of the juvenile adjudications requires reversal of the judgment of death. He asserts that the prejudicial effect of the adjudications was compounded when the prosecutor elicited testimony from Court Reporter Pugh that juvenile proceedings are analogous to criminal trials of adults. He also notes that during its deliberations, the jury asked to see "the file . . . regarding West Covina holdup charges." (The trial court denied the request.) We do not agree that the error was prejudicial. The prosecution also introduced evidence of the facts surrounding the robberies; as explained above, the jury could properly consider this evidence in aggravation as part of its penalty deliberations. Although the juvenile adjudications arguably provided the jury with additional evidence that defendant Champion actually committed those robberies, his participation in the robberies was undisputed. There is no reasonable possibility that the evidence of the juvenile adjudications could have affected the jury's penalty verdict in this case.

B. *Exclusion of Defendant Champion's Reputation in the Raymond Crips Gang*

At the penalty phase of the trial, defendant Champion called as a witness Thomas Crawford, who had been his California Youth Authority parole officer when Champion was arrested. The trial court sustained objections to three questions defense counsel asked Crawford, each of which was designed to elicit testimony that gang members and parolees had told Crawford they did not believe defendant Champion had committed the

murders in this case.[26] Defendant Champion contends that the belief by gang members that he was innocent showed that he "had been making good faith efforts to 'turn his life around' " before his arrest for the murders, and that the trial court therefore erred in sustaining the prosecutor's objections to Champion's questions.

The questions, however, were not intended to show that defendant Champion had "turned his life around." Rather, they were an effort by Champion to introduce hearsay evidence that he was not guilty of the murders. Hearsay testimony is inadmissible at the penalty phase (*People* v. *Edwards* (1991) 54 Cal.3d 787, 837-838 [1 Cal.Rptr.2d 696, 819 P.2d 436]) and the trial court properly sustained the prosecutor's objections.

Defendant Champion maintains that the evidence of what gang members told his parole officer was admissible notwithstanding its hearsay nature. He points out that the United States Supreme Court has held that due process requires the admission of hearsay evidence at the penalty phase of a capital trial, even though a state's evidentiary rules are to the contrary, "if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 704 [276 Cal.Rptr. 788, 802 P.2d 278], quoting *Green* v. *Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 741, 99 S.Ct. 2150].) According to Champion, the evidence was "highly relevant" because it tended to create a "lingering doubt" regarding his guilt, and he is entitled, under the Eighth and Fourteenth Amendments to the United States, to present such evidence as a reason for the jury to spare his life. (See *People* v. *Cox*, *supra*, 53 Cal.3d at pp. 676-677; *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].) But the fact that unidentified gang members, presumably friends of defendant Champion, told a parole officer that they believed in Champion's innocence had little bearing on whether he actually committed the murders and hence was not highly relevant, nor was there reason to believe that these claims were in any way reliable. Thus, the trial court properly excluded the testimony.

---

[26]We briefly summarize the three questions to which the prosecutor objected. First, after Parole Officer Crawford testified that "some people in the community" had mentioned the Hassan murders to him, counsel asked if these people "mention[ed] anything about [the murders] that had to do with Steve Champion's involvement in the case?" Second, defense counsel asked, "was there a reputation in the community involving persons who were either on parole or in gangs . . . regarding whether or not Steve Champion was involved in the Hassan murders?" Third, counsel asked: "Mr. Crawford, assuming that you had heard in the community that Steve Champion was not involved in [the Hassan murders], would it be your feeling then . . . that he did perform satisfactorily [on parole]?"

## C. *The Prosecutor's Closing Argument*

### 1. *Argument That the Absence of Mitigating Evidence Is Aggravating*

Section 190.3 describes the factors in aggravation and mitigation that the jury may consider in deciding whether to impose the death penalty. In *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861] and in subsequent cases (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 144; *People* v. *Cox, supra,* 53 Cal.3d at p. 683; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1034 [248 Cal.Rptr. 568, 755 P.2d 1017]) we have held that the prosecutor may not argue that the absence of certain potentially mitigating factors transforms those factors into factors in aggravation. Defendants argue that in this case the prosecution engaged in the type of argument prohibited by *Davenport.*

This case was tried before our decision in *People* v. *Davenport, supra,* 41 Cal.3d 247. In his closing argument, the prosecutor discussed each of the statutory factors in aggravation and mitigation to be considered by the jury in its deliberations, telling the jury that because there was no mitigating evidence, it should consider certain mitigating factors as being factors in aggravation.[27] This argument was improper.

Defendants, however, never objected to the prosecutor's argument, and therefore have not preserved the issue for consideration on appeal. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 702 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].) In any event, we have consistently concluded that arguments of this nature are nonprejudicial (see, e.g., *People* v. *Montiel* (1993) 5 Cal.4th 877, 937 [21

---

[27]Thus, when discussing factor (d) of section 190.3 ("Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."), the prosecutor said: "Well, there is no evidence, of course, of anything of that nature whatsoever, the only evidence is that these killings were brutal and cold-blooded. [¶] So again as to both defendants we have a strong factor in aggravation." Similarly, when discussing the factor described in section 190.3, factor (e) ("Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act."), the prosecutor said: "Well, what we are talking about here is something like the dual [*sic*] or mutual combat, the rare instance of a suicide compact. [¶] I don't mean to be funny. We have crimes where people engage in sadomasochistic relations and one of them goes too far and kills somebody. [¶] That is what we mean by the victim participating in or consent in the conduct. [¶] Of course, we have no consent in the conduct in this case. We have strong aggravation by the defendant." With regard to factor (g) of section 190.3 ("Whether or not defendant acted under extreme duress or under the substantial domination of another person."), the prosecutor said, "[Defendant Champion] is bigger than Mr. Ross, first of all, and [there] is no evidence in this case presented at the guilt phase, or at the penalty phase of this trial, [that] Mr. Champion was acting under the duress of anybody. [¶] So again we have a factor in aggravation as to both defendants."

Cal.Rptr.2d 705, 855 P.2d 1277]), and we do so here. The prosecutor's erroneous argument related to the circumstances surrounding the offense; the jury was not misled as to the nature of these circumstances, and was free to weigh them appropriately. In these circumstances, " 'a reasonable jury would not assign substantial aggravating weight to the absence of unusual extenuating factors.' " (*People* v. *Clark* (1992) 3 Cal.4th 41, 169 [10 Cal.Rptr.2d 554, 833 P.2d 561], quoting *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1234 [275 Cal.Rptr. 729, 800 P.2d 1159].)

### 2. *Inflammatory Argument*

Defendants accuse the prosecutor of misconduct in his closing argument, by appealing to the jury's "passion and prejudice" and by engaging in "inflammatory argument."

In his closing argument, the prosecutor noted that some members of the jury might feel anger and outrage at the crimes both defendants had committed. Anticipating that the defense might argue that "it is wrong to make your decision in anger," the prosecutor stated: "It is wrong only to make your decision solely because of anger." He also argued that by committing the murders, defendants showed that they believed in the death penalty, and he commended the jury in advance for its "courage" in sentencing defendants to death. Defendants argue that these remarks were improper, but neither defendant objected to them. Even if one assumes that the prosecutor's comments were improper, any conceivable prejudice arising from them could have been cured by a timely objection and admonition. Thus, defendants have not preserved the right to complain about them on appeal. (*People* v. *Price* (1991) 1 Cal.4th 324, 440 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Defendants also assert that other comments by the prosecutor in closing argument implied that they should be sentenced to death because they would be a danger to other prisoners and to prison guards if they were sentenced to life imprisonment without possibility of parole. ▮▮▮ Although we have held that at the penalty phase of a capital case the prosecutor may not introduce expert testimony forecasting that, if sentenced to life without the possibility of parole, a defendant will commit violent acts in prison (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 779 [175 Cal.Rptr. 738, 631 P.2d 446]), we have never held that in closing argument a prosecutor may not comment on the possibility that if the defendant is not executed he or she will remain a danger to others. Rather, we have concluded that the prosecutor may make such comments when they are supported by the evidence. (*People* v. *Pinholster*, *supra*, 1 Cal.4th at p. 963; *People* v. *Bell* (1989) 49 Cal.3d 502, 549 [262 Cal.Rptr. 1, 778 P.2d 129].) In any event, defendants' failure to object

to the prosecutor's comments bars them from complaining about the comments on appeal. (*People* v. *Price, supra,* 1 Cal.4th at p. 440.)

### 3. *Commenting on Defendants' Demeanor*

At the conclusion of the guilt phase of the trial, when the jury returned its verdicts convicting both defendants of murder with special circumstances, defendants stood up, and defendant Champion uttered an obscenity. The trial court told defendants to sit; they refused and began walking toward the holding area; defendant Champion said he was being "railroaded." The bailiff then escorted defendants to the holding area.

In his closing argument at the penalty phase of the trial, the prosecutor commented on this behavior by defendants on three occasions. First, he argued that defendants' behavior showed that they would be a danger to others if they were sentenced to life imprisonment without possibility of parole.[28] The prosecutor again briefly referred to this incident when he discussed whether either defendant had acted under the domination of another person in committing the murders.[29] At a later point, the prosecutor argued that defendants' behavior in response to the jury's verdicts showed defendants' lack of remorse for their crimes.[30]

Defendants contend the prosecutor's comments were impermissible because a defendant's demeanor in court is not a factor that the jury in a capital case is entitled to consider in aggravation, because jury consideration of such demeanor renders "meaningful appellate review" by an appellate court that did not observe the conduct impossible. Also, defendants assert, the prosecutor's comment on their demeanor violated their privilege against self-incrimination and their right to due process of law. Neither defendant, however, objected to the prosecutor's comments at trial. Because a timely objection and admonition would have negated any harm arising from the

---

[28]The prosecutor said: "I ask you to recall the display that was put on for you by the defendants, and particularly Mr. Ross, when the verdicts were rendered at a time when it should have been most important in his whole life to behave like a civilized person in front of the jury. [¶] Mr. Ross engaged in a confrontation with the guards here and almost got into a fight with them. [¶] Is that the kind of person from whom we can protect not only the society outside of prison but society inside prison by incarcerating him for the rest of his life?"

[29]The prosecutor said: "When you rendered those verdicts that you so carefully considered after listening to so much evidence, [defendant Ross] was the one who first got up and in mock indignation started to walk toward the lockup, Mr. Champion followed. [¶] But the fact that Mr. Ross is or may be the leader here does not mean that Mr. Champion was acting under duress or under domination. [¶] Mr. Champion follows along because he wants to."

[30]The prosecutor said: "Did either of them show you any remorse when they did that mock display of indignation for you when you rendered the verdicts of guilt, verdicts which you rendered not because you delighted in doing so but because you had to, you had no choice based upon the law and the evidence. [¶] Did that show remorse on their part?"

prosecutor's comments, defendants are barred from now attacking the propriety of the prosecutor's argument. (*People* v. *Price, supra,* 1 Cal.4th at p. 440.)

### 4. Commenting on Tape-recorded Statements

In his penalty phase argument, the prosecutor made reference to defendants' tape-recorded conversations, introduced by the prosecution at the guilt phase of trial. (See pt. II.A, *ante.*) He suggested that portions of the conversations showed that defendant Ross was the "leader" in committing the murders in this case, that Ross showed no remorse for his crimes, and that defendants would remain a threat to society if they were sentenced to life imprisonment without possibility of parole, because they might try to escape from prison or attack a prison guard. (As previously explained, in the conversations defendants fantasized about wanting to escape and to "blow up" the driver of the van transporting them to court.)

■ Defendant Ross argues that the prosecutor committed misconduct by referring to the tape-recorded conversations in this fashion, because the prosecutor gave no notice that he intended to use the conversations at the penalty phase. He asserts that the prosecutor was obligated to give such notice under section 190.3.

Because defendant Ross did not object to the prosecutor's comments regarding the tape-recorded conversations, he has not preserved the right to challenge them on appeal. In any event, section 190.3 provides that the prosecutor need not give notice of "evidence in proof of the offense . . . which subject[s] a defendant to the death penalty."[31] As the tape-recorded conversations were evidence used at the guilt phase of trial to establish defendant Ross's guilt of the murders for which he is subject to the death penalty, the prosecutor did not have to give notice that he intended to rely on them at the penalty phase.

### 5. Commenting on Defendants' Gang Membership

■ During his penalty phase argument, the prosecutor made frequent reference to the fact that defendants were gang members. Defendants argue that the prosecutor's comments were improper, because their gang membership had no bearing on any of the statutory factors in aggravation that the

---

[31]Section 190.3 provides, in relevant part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."

jury may consider at the penalty phase of trial. (§ 190.3.) Not so. Because the evidence suggested that the murders in this case were committed by defendants' gang, defendants' membership in that gang was one of the "circumstances of the crime" (§ 190.3, factor (a)) that the jury could properly consider in aggravation. In any event, defendants' failure to object to the prosecutor's comments bars them from raising this issue on appeal.

### 6. Commenting on Lack of Remorse

Defendants argue that the prosecutor committed misconduct by asserting in his closing argument that defendants lacked remorse for their crimes. Defendants did not, however, object to the prosecutor's argument on this ground, and properly so. As we recently explained, "lack of remorse, because it suggests the absence of a mitigating factor, is deemed a relevant factor in the jury's determination as to whether the factors in aggravation outweigh those in mitigation, and [is] thus an appropriate subject of comment by the prosecutor, so long as he or she does not argue that lack of remorse constitutes a factor in aggravation." (People v. Crittenden (1994) 9 Cal.4th 83, 150 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The prosecutor's argument in this case may reasonably be construed as urging the jury not to find remorse as a mitigating factor.

### D. Instruction to Consider Sympathy

Defendants contend that the trial court erred in failing to instruct the jury, on its own initiative, that in its penalty phase deliberations it could consider sympathy or compassion for the defendants. We have consistently held, however, that the trial court does not have to give such an instruction. (People v. Clark, supra, 3 Cal.4th at p. 163; People v. Andrews, supra, 49 Cal.3d at pp. 227-228; People v. Williams (1988) 44 Cal.3d 883, 955 [245 Cal.Rptr. 336, 751 P.2d 395]; see also California v. Brown (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

### E. Instruction on Factors in Aggravation and Mitigation

The trial court read to the jury CALJIC No. 8.84.1, the standard instruction describing the factors in aggravation and mitigation that the jury may consider in determining penalty.[32] Defendants challenge this instruction in four different respects.

---

[32]The court instructed the jury: "In determining which penalty is to be imposed on each defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of

## 1. *Deletion of Irrelevant Factors*

Defendants argue that the trial court should have omitted from the instruction factors (d) (mental or emotional disturbance), (e) (victim's participation in the homicide), (f) (moral justification for the crimes), (g) (duress), (h) (mental impairment), and (j) (defendant a minor participant in the crimes), because these factors were inapplicable to the facts of this case. Defendants concede, however, that we have repeatedly rejected this contention. (See, e.g., *People* v. *Sims* (1993) 5 Cal.4th 405, 465 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].) We see no reason to reconsider these decisions.

## 2. *Double Counting of Factors*

 Defendants point out that as part of the instruction describing the factors in aggravation and mitigation, the trial court told the jury that it could consider: "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding, and the existence of any special circumstances found to be true; [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence, or the express or implied threat to use force or violence; [¶] (c) The presence or absence of any prior felony conviction . . . ." Defendants argue that this portion of the instruction improperly permitted the jury to "double count" the violent conduct that led to their convictions of burglary, robbery, and murder at the guilt phase of the trial, by considering their conduct both as "circumstances of the crime" (§ 190.3, factor (a)) and as "criminal activity . . . which involves the use . . . of force or violence" (*id.,* factor (b)).

---

any special circumstances found to be true. [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction. [¶] (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] (e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] (g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication. [¶] (i) The age of the defendant at the time of the crime. [¶] (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

Similarly, they argue that the jury may have considered the special circumstances it had found to be true at the guilt phase of trial both as circumstances of the offense (*id.*, factor (a)) and as prior felony convictions (*id.*, factor (c)).

In *People* v. *Miranda, supra,* 44 Cal.3d 57, we directed that henceforth the trial court should explain to the jury that the violent criminal conduct referred to in section 190.3, factor (b) and the prior felony convictions referred to in factor (c) do not include the evidence underlying the guilt determination. (44 Cal.3d at p. 106, fn. 28.) Because this case was tried before our decision in *Miranda,* the trial court gave no such explanation. But as we said in *People* v. *Montiel, supra,* 5 Cal.4th at page 938: "[W]e have consistently found that the absence of a clarifying instruction on this issue is harmless." The same is true here. In his closing argument, the prosecutor did not suggest to the jury that it should "double count" the evidence introduced or the jury's findings at the guilt phase of trial; as a result, it is unlikely that the jury gave the evidence and findings duplicative consideration.

Defendants complain that the instruction describing aggravating and mitigating circumstances was defective because "the jury was not instructed that the fact that [defendants] had been convicted of first degree murder and the fact of the true findings on the special circumstances were not, in themselves, aggravating circumstances." They appear to contend that because the trial court did not give this instruction, the jury may have "double counted" the circumstances of their offenses by considering the convictions and special circumstances, and by separately considering the facts that led to the convictions and special circumstance findings. Such an instruction would only have confused the jury; therefore, the trial court acted properly in not giving it.

Defendant Champion faults the trial court for not telling the jury that it could not consider his felonious assaults on Vincent Verkuilen and Jose Bustos both as violent criminal conduct (§ 190.3, factor (b)) and as a prior felony conviction (*id.,* factor (c)). We have held, however, that a penalty phase jury is entitled to consider such evidence under both factors. (*People* v. *Montiel, supra,* 5 Cal.4th at p. 939, fn. 34; *People* v. *Melton, supra,* 44 Cal.3d at p. 764.)

### 3. *Jury's Consideration of Mitigating Evidence*

■ Defendants argue that the trial court's instruction to the jury describing the circumstances in aggravation and mitigation did not adequately inform the jury that it could consider the mitigating evidence presented at the

penalty phase. As they point out, the United States Supreme Court has held that at the penalty phase of a capital case, the jury must be permitted to consider " 'any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869].)

In this case, the trial court instructed the jury that it could consider: "(k) Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime." The United States Supreme Court has held that this instruction is not, in and of itself, constitutionally inadequate. (*Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].) But in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], decided after the trial in this case, we directed that trial courts should, to avoid confusion, instruct the jury that it may consider "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Id.* at p. 878, fn. 10.) In cases that, like this one, were tried before our decision in *Easley*, we examine the record "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440]; see also *People* v. *Payton* (1992) 3 Cal.4th 1050, 1071 [13 Cal.Rptr.2d 526, 839 P.2d 1035].)

Having reviewed the record in this case, we see no reason to conclude that the jury was misled regarding the scope of its sentencing discretion. In his closing argument, the prosecutor never suggested that the jury could not consider the mitigating evidence. To the contrary, the prosecutor specifically informed the jury that it could consider "any evidence of mitigation, not only surrounding the crime itself, but about [defendants'] lives in general." The prosecutor then discussed the evidence in mitigation offered by defendants, and argued, in essence, that this evidence was inadequate to outweigh the evidence in aggravation offered by the prosecution. We find no reasonable possibility that the jury was misled into believing that it could not consider defendants' mitigating evidence.

### 4. *Jury's Consideration of Guilt Phase Evidence*

■ The instruction describing the factors in aggravation and mitigation also told the jury that it could consider "all of the evidence which has been received during any part of" the trial. Defendants argue that this portion of the instruction was improper, because it permitted the jury to consider, in aggravation, guilt phase evidence that was unrelated to any of the aggravating factors set forth in section 190.3. Not so.

The evidence introduced by the prosecution at the guilt phase of defendants' trial was relevant to prove defendants guilty of the murders charged in

this case. So long as it considered the evidence offered at the guilt phase of trial solely for this purpose, the jury was entitled to take into account all of the evidence offered at the guilt phase as part of the "circumstances of the crime," an aggravating factor that the jury may consider in its penalty deliberations. (§ 190.3, factor (a).) Therefore, the trial court did not err when it instructed the jury that it could consider guilt phase evidence in its penalty deliberations.

True, the jury might also have considered some of the evidence the prosecution introduced at the guilt phase of trial (e.g., evidence that defendants were gang members for many years, that they used profanities and racial slurs in their conversation, and that their nicknames were "Evil" and "Treacherous") as evidence of bad character, and thus as aggravating evidence of a type not statutorily authorized. If defendants had requested the trial court to instruct the jury that it could consider this evidence only for the light it shed on defendants' guilt, such an instruction would perhaps have been appropriate. Defendants, however, did not request such an instruction, and the trial court was not obligated to give such an instruction on its own initiative. (*People* v. *McLain, supra,* 46 Cal.3d 97, 113.)

F. *Weighing Aggravating and Mitigating Circumstances*

In its penalty phase instructions to the jury, the trial court gave the following pattern instruction explaining to the jury the manner in which it was to weigh aggravating and mitigating circumstances: "After having heard all the evidence and after having heard and considered the arguments of counsel you shall consider, take into account and be guided by the applicable factor [*sic*] of aggravating and mitigating circumstances upon which you have been instructed. [¶] *If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death.* However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." (See CALJIC No. 8.84.2.) Defendants argue that the italicized portion of this instruction, informing the jurors that they "shall" impose a sentence of death if they find that the circumstances in aggravation outweigh the circumstances in mitigation, misled the jurors as to their sentencing duties, in violation of the Eighth and Fourteenth Amendments to the federal Constitution and article I, sections 7, subdivision (a) and 15 of the California Constitution.

As we explained in *People* v. *Brown, supra,* 40 Cal.3d 512, 541, this instruction might cause a jury to misunderstand its duties in two interrelated respects. First, although individual jurors are free to assign each of the statutory factors whatever weight they deem appropriate, the instruction might lead the jury to believe that the process of weighing factors in

aggravation and mitigation is a "mere mechanical counting of factors." Second, the instruction might mislead individual jurors into thinking they had to impose the death penalty even if they did not consider death an appropriate punishment under all of the circumstances in the case before them. (*People* v. *Andrews*, *supra*, 49 Cal.3d at pp. 228-229; *People* v. *Allen*, *supra*, 42 Cal.3d at p. 1277; *People* v. *Brown*, *supra*, 40 Cal.3d at p. 541.) Our task is to examine each case individually to determine whether the instruction misled the jury in a manner that prejudiced the defendant. (*People* v. *Andrews*, *supra*, 49 Cal.3d at p. 229.)

▮▮▮ In this case, the jury was not misled. In their closing arguments to the jury, neither the prosecutor nor the two defense attorneys discussed the nature of the weighing process in depth. The prosecutor discussed each of the statutory factors in aggravation and mitigation, and applied them to the facts of this case. The defense attorneys stressed that life without possibility of parole was a harsh penalty, that there was no evidence that either defendant was the actual killer of any of the victims, and that Evan Malett, the only robber observed with a gun in the robbery of the Taylor residence and thus the probable actual killer of Michael Taylor, was convicted of murder without special circumstances, and therefore received a lesser sentence than either of the defendants in this case. Neither the prosecutor nor defense counsel suggested that the process of weighing the aggravating and mitigating circumstances was a mechanical process. To the contrary. As counsel for defendant Ross told the jury: "Now, when we talk about mitigating circumstances and aggravating circumstances it's not the number, because one mitigating circumstance can be sufficient. One can be sufficient."

None of the attorneys told the jury that it could sentence defendants to death without deciding that death was the appropriate penalty under the facts and circumstances of this case. Defendants insist that the prosecutor did so when he argued that "the law requires" imposition of the death penalty, and that "under the guidelines given . . . by the judge, [the juror's] duty [to impose the death penalty] is very clear." But these comments, in context, did not misstate the law, as they "referred to the absence of discretion to disregard the law or to act on mere unbridled passion and prejudice." (*People* v. *Clark*, *supra*, 3 Cal.4th at p. 166.) The prosecutor's comments did not mislead the jury regarding the nature of its responsibilities.[33]

---

[33]Because of this conclusion, we decline the Attorney General's suggestion that we reconsider *People* v. *Brown*, *supra*, 46 Cal.3d 432, in light of the United States Supreme Court's decision in *Boyde* v. *California*, *supra*, 494 U.S. 370. (*People* v. *Procter* (1992) 4 Cal.4th 499, 549, fn. 12 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; *People* v. *Webster* (1991) 54

### G. *Trial Court's Failure to Instruct Jury That Unadjudicated Criminal Activity Must Be Proven Beyond a Reasonable Doubt*

 As mentioned earlier, at the guilt phase of the trial the prosecution presented evidence of both the murder of Teheran Jefferson, with which neither defendant was charged or convicted, and the murder of Michael Taylor, with which defendant Champion was not charged. Defendants contend the trial court committed reversible error when it failed to instruct the jury that it could only consider this evidence as part of its penalty determination if it found *beyond a reasonable doubt* that the defendants committed these crimes.

The trial court should indeed have given this instruction. In *People v. Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279], we held that the trial court must, on its own initiative, instruct the jury that no juror may consider aggravating evidence that a defendant has committed other violent crimes unless that juror finds beyond a reasonable doubt that the defendant committed those crimes. Although here it was at the guilt phase that the prosecution presented evidence that defendants had committed other crimes, whereas in *Robertson* such evidence was presented at the penalty phase, this distinction is not significant, because the trial court in this case told the jury that, in making its penalty determination, it should consider "all of the evidence which has been received during any part of the trial of this case . . . ."

Nevertheless, we conclude that the trial court's failure to give the required instruction was harmless. In his closing argument, the prosecutor acknowledged that the jury could not consider the evidence of the Jefferson murder (as to both defendants) and of the Taylor murder (as to defendant Champion) unless it found *beyond a reasonable doubt* that the defendants committed these crimes, and the prosecutor implied that the jury should not consider those crimes at all.

In discussing whether both defendants had engaged in violent criminal conduct other than the murders of which they were convicted, the prosecutor told the jury: "Now, I don't know whether the Judge will instruct you additionally in this regard, but I will tell you whether he does or not I do not think for purposes of this particular standard that you should consider the defendants to have committed the Jefferson murder, or that you should consider Mr. Champion to have committed the Taylor murder unless during the guilt phase of the trial you found and *you still find beyond reasonable*

Cal.3d 411, 452, fn. 23 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People v. Gonzalez, supra,* 51 Cal.3d 1179, 1231, fn. 30.)

*doubt that the two defendants committed the Jefferson murder, and that Champion committed the Taylor murder.* [¶] The problem I have at this point is you didn't have to find that in order to make your decision as to the charged counts, and you did not render a verdict on those counts. [¶] Therefore, I do not know what you found, and *I'm not going to belabor that by asking you for a finding at this time.* [¶] So, my discussion, ladies and gentlemen, will be simply directed towards those crimes—that is, with regard to this rule—with respect to those crimes of which the defendants were convicted in the past, and my discussion later on will be with respect only to those crimes of which the defendants were convicted in the present case." (Italics added.) In the remainder of his closing argument, the prosecutor did not rely either on the Jefferson murder, or on the evidence showing that defendant Champion participated in the murder of Michael Taylor.

Thus, in his closing argument, the prosecutor acknowledged that the jurors could not consider, in aggravation, the fact that defendants had engaged in other criminal activity unless they found beyond a reasonable doubt that such activity occurred. The prosecutor also acknowledged that the jury had not explicitly made such findings at the guilt phase of the trial, and said that he was not asking jurors to make such findings at the penalty phase. Given this concession, we find no reasonable possibility that the outcome of the penalty phase was affected by the trial court's failure to instruct the jury that it could consider "other crimes" evidence only if it found beyond a reasonable doubt that defendants committed those crimes.[34]

## H. *Challenges to the Constitutionality of the Death Penalty*

Defendants briefly contend that California's capital scheme violates the federal Constitution because (a) the statutory factors in aggravation are unconstitutionally vague; (b) the jury at the penalty phase of a capital case is not required to make written findings on the factors in aggravation; (c) the jury at the penalty phase of a capital trial is not instructed that it may consider only those aggravating factors found to be true beyond a reasonable doubt, and that it should impose the death sentence only if it determines beyond a reasonable doubt that death is the appropriate penalty; (d) this

---

[34]We also reject defendants' contention that the trial court, on its own initiative, should have instructed the jury that it could not consider defendants to be gang members unless it found beyond a reasonable doubt that they were members. *People* v. *Robertson, supra,* 33 Cal.3d 21, only requires the court to instruct the jurors not to consider evidence of unadjudicated criminal offenses unless they find beyond a reasonable doubt that the defendant committed those crimes. As previously explained (see pt. II.E.4., *ante*), defendants' gang membership is a circumstance of the murders in this case. It is not a separate criminal offense.

court does not conduct "intercase proportionality review" of a death sentence;[35] (e) the jury at the penalty phase of a capital case is permitted to consider unadjudicated criminal activity by the defendant in making its penalty determination; (f) the inclusion of adjectives such as "extreme" and "substantial" in section 190.3's list of potentially mitigating factors acts as a barrier to the consideration of mitigating evidence; (g) the California statutory scheme contains so many special circumstances that it fails to perform a narrowing function; (h) the prosecutor has unbridled discretion in determining whether to seek the death penalty in a capital case. We have rejected each of these contentions in the past (see, e.g., *People* v. *Bacigalupo* (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808] [issue (a)]; *People* v. *Andrews, supra,* 49 Cal.3d at p. 233 [issues (b), (d)]; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297] [issue (c)]; *People* v. *Pride* (1992) 3 Cal.4th 195, 268 [10 Cal.Rptr.2d 636, 833 P.2d 643] [issue (e)]; *People* v. *Turner* (1994) 8 Cal.4th 137, 208-209 [32 Cal.Rptr.2d 762, 878 P.2d 521] [issue (f)]; *People* v. *Crittenden, supra,* 9 Cal.4th 83, 154-155 [issue (g)]); *People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1024 [issue (h)]), and we decline to reconsider these holdings.

I. *Motion to Modify the Death Penalty*

█ Before ruling on each defendant's motion to modify the jury's death verdicts to the punishment of life imprisonment without the possibility of parole (§ 190.4, subd. (e)), the trial court stated that it had "read and considered the [probation] reports filed as to each defendant." Defendants argue that this statement indicated an improper reliance on the probation reports, thus requiring that the case be remanded for a new modification hearing. As defendants point out, the trial court must base its ruling on the modification motion solely on the evidence produced at trial; this, of course, does not include a defendant's probation reports. (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 150.)

But even when the trial court has considered such extraneous information, we assume that it has had no improper influence on the court, absent specific evidence to the contrary. (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 150; *People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) In this case, there is nothing in the record to indicate that the

---

[35]Defendants also assert that the death penalty is unconstitutional because this court does not conduct "intracase proportionality review." They are wrong; we do, upon request, conduct such review, although our review is limited to an examination of the defendant's individual culpability. (See, e.g., *People* v. *Hill* (1992) 3 Cal.4th 959, 1014 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People* v. *Andrews, supra,* 49 Cal.3d at p. 234.)

information contained in defendants' probation reports had any effect on the trial court's decision to deny defendants' motions to modify the verdicts of death. To the contrary, the court recited at length its reasons for denying the motions, none of which had anything to do with the information contained in the probation reports. A remand for a renewed modification hearing is therefore unnecessary.

## CONCLUSION

Defendant Ross's two duplicative multiple-murder special circumstances and defendant Champion's duplicative multiple-murder special circumstance are ordered stricken. In all other respects, the judgments, including the death sentences as to both defendants, are affirmed.

Lucas, C. J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment against defendants Steven Allen Champion and Craig Anthony Ross.

I also concur generally in the opinion for the court prepared by Justice Kennard.

I write separately to express my concerns with regard to Ross. The record unmistakably suggests that, in contravention of the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, Ross suffered constructive denial of counsel bearing on the sentence of death and perhaps also on the determination of guilt and death eligibility. The performance by his attorneys, especially in preparation for, and during the course of, the penalty phase, appears not merely deficient, but virtually nonexistent. Nevertheless, I am compelled to observe that, although it does so unmistakably, the record only *suggests* constructive denial of counsel. That is not enough. Final determination must therefore await habeas corpus, in which the record does not limit our view.

With that said, I concur in the judgment.

Appellants' petitions for a rehearing were denied June 1, 1995, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition of appellant Craig Anthony Ross should be granted.